

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| TERESA ANN CULPEPPER, | ) |
| | ) |
| Plaintiff. | ) |
| | ) |
| vs. | ) |
| | ) |
| CITY OF ATLANTA. | ) |
| GEORGE N. TURNER, individually. | ) |
| CALVIN MOSS. individually, | ) |
| ERNEST J. FINLEY, JR., individually, | ) |
| ERIKA SHIELDS, individually, | ) CIVIL ACTION |
| TIMOTHY QUILLER. individually, | ) FILE NO. 2012-CV-215514 |
| JEFFERY L. GLAZIER, individually, | ) |
| NICOLE D. AGUINAGA, individually, | ) |
| JAIDON CODRINGTON, individually, | ) |
| JUSTIN STROM, individually, | ) **JURY TRIAL DEMANDED** |
| FULTON COUNTY, GEORGIA, | ) |
| THEODORE JACKSON, individually, | ) |
| LENORE VANDERPOOL, individually, | ) |
| SHARON JACKSON, individually, | ) |
| ASHLEY THORNTON. individually, | ) |
| VERNISSA PERRY, individually, | ) |
| PAUL L. HOWARD, JR., individually, | ) |
| STEPHEN PUTNAM. individually, | ) |
| WAVERLY SETTLES, individually, | ) |
| REBECCA KEEL, individually, | ) |
| MELANIE DAVIS, individually, | ) |
| ARTHUR WALTON, individually, | ) |
| WESLEY VANN, individually, | ) |
| JAMIE WILSON, individually, | ) |
| FELICIA DEAS, individually, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**
**FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF**

COMES NOW, Teresa Ann Culpepper, Plaintiff in the above-styled matter ("Plaintiff" or

"Ms. Culpepper"). and files her First Amended Complaint for Damages and Declaratory and

Injunctive Relief ("First Amended Complaint") against the Defendants, and as grounds therefore respectfully shows this Honorable Court as follows:

## NATURE OF THE ACTION

1.

This is a civil action seeking damages against Defendants for committing acts under color of law, and depriving Plaintiff of rights secured by the United States Constitution and the laws of the United States. Defendants deprived Plaintiff of her liberty and freedoms without due process of law and made an unreasonable search and seizure of Plaintiff's person and property in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. This First Amended Complaint asserts a civil rights action pursuant to 42 U.S.C. § 1983 for damages and declaratory and injunctive relief to redress Defendants' violations of Plaintiff's rights under the United States Constitution and under the applicable portions of the Georgia Constitution to not be searched and seized, to be falsely arrested, or to be unlawfully restrained and incarcerated. This First Amended Complaint also seeks redress for numerous Georgia state law torts that Defendants have committed, including false arrest, false imprisonment, and malicious prosecution.

2.

Defendants violated Plaintiff's rights under the United States and Georgia Constitutions and committed state law torts against Plaintiff when, without any justification, evidence or probable cause, and while acting under color of statutes, ordinances, customs and usage of the City of Atlanta ("City"), Atlanta Police Department ("APD"), the Fulton County, Georgia ("County"), the Fulton County Sheriff's Department ("Sheriff") and the Fulton County District Attorney's Office ("District Attorney"), and their respective employees and agents, Defendants

- 2 -

arrested Plaintiff on August 21, 2011, forced Plaintiff to remain incarcerated in the Fulton County Jail for nearly two months, and maliciously prosecuted Plaintiff knowing she was innocent of the crimes charged against her.  Defendants' actions in searching, arresting, incarcerating and prosecuting Plaintiff were undertaken maliciously and without any probable cause or evidence to suggest that Plaintiff had committed any crime.

3.

Plaintiff seeks monetary damages and declaratory and injunctive relief as set forth further herein.

## PARTIES

4.

At all times relevant to this action, Plaintiff was a citizen of the State of Georgia and resided at 1456 Hawkins Street, Atlanta, Georgia 30318, which is located entirely within the geographic area of APD's Zone 1 precinct.

5.

The City is a political subdivision of the State of Georgia.  The City is responsible for the supervision, maintenance and operation of APD and its employees and agents.  The City is a municipal governmental entity and maintains an office at 55 Trinity Avenue, S.W., Atlanta, Georgia.  The City was served with a copy of the Summons and Complaint on May 29, 2012.  At all times relevant to this action, the City promulgated, encouraged, enforced and maintained a policy of using arrest quotas to measure and evaluate APD officer job performance.  At all times relevant to this action, the City promulgated, encouraged, enforced and maintained a policy of effecting searches and arrests of individuals without a valid search or arrest warrant.  At all times relevant to this action, the City promulgated, encouraged, enforced and maintained a policy of

- 3 -

relying on employees of the Fulton County District Attorney "Complaint Room", instead of a judge, to establish probable cause for effecting the search and arrests of individuals. The City's policies, practices and customs were a moving force in the constitutional and statutory violations set forth herein.

6.

At all times relevant to this action, Defendant George Turner ("Turner") was the Chief of Police for APD and employed by the City. At all times relevant to this action, Turner had ultimate responsibility for the hiring, training, supervision and/or firing of the APD employees who are defendants in this action. Turner is responsible and liable for the actions or omissions of the employees of APD named as defendants in this action. At all times relevant to this action, Turner was responsible for drafting, implementing and ensuring compliance with APD's Standard Operating Procedures ("SOP's") and directives. At all times relevant to this action, Turner implemented the practices, policies and customs of the City that were a moving force in the constitutional and statutory violations set forth herein. He is sued in his individual capacity. At all times relevant to this action, Turner was acting under color of state law.

7.

At all times relevant to this action, Defendant Calvin Moss ("Moss") was the Deputy Chief of Police for APD and Commander of APD's Criminal Investigations Division and employed by the City. At all times relevant to this action, Moss was responsible for the hiring, training, supervision and/or firing of employees in APD's criminal investigations unit who were responsible for the investigation of crimes committed against persons or property in the City and who are defendants in this action. Moss is responsible and liable for the actions or omissions of the employees of APD named as defendants in this action. At all times relevant to this action,

- 4 -

Moss was responsible for implementing and ensuring officer compliance with APD's SOP's and directives. At all times relevant to this action, Moss implemented the practices, policies and customs of the City that were a moving force in the constitutional and statutory violations set forth herein. He is sued in his individual capacity. At all times relevant to this action, Moss was acting under color of state law. Moss was served with a copy of the Summons and Complaint on May 31, 2012.

8.

At all times relevant to this action, Defendant Ernest J. Finley, Jr. ("Finley") was the Deputy Chief of Police for APD and Commander of APD's Field Operations Division and employed by the City. At all times relevant to this action, Finley was responsible for the hiring, training, supervision and/or firing of uniformed patrol officers in APD's field operations unit, including the patrol officers assigned to the Zone 1 Precinct who were responsible for patrolling the streets, answering calls for service, investigating alleged crimes and making arrests of alleged suspects and who are defendants in this action. Finley is responsible and liable for the actions or omissions of the employees of APD named as defendants in this action. At all times relevant to this action, Finley was responsible for implementing and ensuring officer compliance with APD's SOP's and directives. At all times relevant to this action, Finley implemented the practices, policies and customs of the City that were a moving force in the constitutional and statutory violations set forth herein. He is sued in his individual capacity. At all times relevant to this action, Finley was acting under color of state law. Finley was served with a copy of the Summons and Complaint on May 29, 2012.

9.

At all times relevant to this action, Defendant Erika Shields ("Shields") was a Major in APD and served as APD's Chief of Staff and employed by the City. At all times relevant to this action, Shields was responsible for the hiring, training, supervision and/or firing of APD employees assigned to the Zone 1 Precinct who were responsible for patrolling the streets, answering calls for service, investigating alleged crimes and making arrests of alleged suspects and who are defendants in this action. Shields is responsible and liable for the actions or omissions of the employees of APD named as defendants in this action. At all times relevant to this action, Shields was responsible for implementing and ensuring officer compliance with APD's SOP's and directives. At all times relevant to this action, Shields implemented the practices, policies and customs of the City that were a moving force in the constitutional and statutory violations set forth herein. She is sued in her individual capacity. At all times relevant to this action, Shields was acting under color of state law.

10.

At all times relevant to this action, Defendant Timothy Quiller ("Quiller") was a Major in APD and the commanding APD officer for the Zone 1 Precinct and employed by the City. At all times relevant to this action, Quiller was responsible for the hiring, training, supervision and/or firing of APD employees assigned to the Zone 1 Precinct who were responsible for patrolling the streets, answering calls for service, investigating alleged crimes and making arrests of alleged suspects in Zone 1 and who are defendants in this case. At all times relevant to this action, Quiller was responsible for implementing and ensuring officer compliance with APD's SOP's and directives. At all times relevant to this action, Quiller implemented the practices, policies and customs of the City that were a moving force in the constitutional and statutory violations set

- 6 -

forth herein. He is sued in his individual and capacity. At all times relevant to this action,
Quiller was acting under color of state law.

11.

At all times relevant to this action, Defendant Jeffrey L. Glazier ("Glazier") was a Major
in APD and the commanding officer for APD's Training Academy and employed by the City.
At all times relevant to this action, Glazier was responsible for the training and/or supervision of
APD employees assigned to the Zone 1 Precinct who were responsible for patrolling the streets,
answering calls for service, investigating alleged crimes and making arrests of alleged suspects
in Zone 1 and who are defendants in this action. Glazier is responsible and liable for the actions
or omissions of the employees of APD named as defendants in this action. At all times relevant
to this action, Glazier was responsible for implementing and ensuring officer compliance with
APD's SOP's and directives. At all times relevant to this action, Glazier implemented the
practices, policies and customs of the City that were a moving force in the constitutional and
statutory violations set forth herein. He is sued in his individual capacity. At all times relevant
to this action, Glazier was acting under color of state law. Glazier was served with a copy of the
Summons and Complaint on May 31, 2012.

12.

At all times relevant to this action, Defendant Nicole D. Aguinaga ("Aguinaga") was
employed by the City as a law enforcement officer with APD and assigned to the Zone 1
Precinct. At all times relevant to this action, she acted in her role as an APD officer. She is sued
in her individual capacity. At all times relevant to this action, Aguinaga was acting under color
of state law. Aguinaga was served with a copy of the Summons and Complaint on May 29,
2012.

- 7 -

13.

At all times relevant to this action, Defendant Jaidon Codrington ("Codrington") was employed by the City as a law enforcement officer with APD and assigned to the Zone 1 Precinct. At all times relevant to this action, Codrington was acting in his role as an APD officer. He is sued in his individual capacity. At all times relevant to this action, Codrington was acting under color of state law. Codrington was served with a copy of the Summons and Complaint on June 4, 2012.

14.

At all times relevant to this action, Defendant Justin Strom ("Strom") was employed by the City as a law enforcement officer with APD. At all times relevant to this action, Strom was acting in his role as an APD officer. He is sued in his individual capacity. At all times relevant to this action, Strom was acting under color of state law.[1]

15.

Defendant Fulton County is a political subdivision of the State of Georgia. Fulton County is a county governmental entity and maintains an office at 141 Pryor Street, Atlanta, Georgia 30303. Fulton County was served with a copy of the Summons and Complaint on May 29, 2012. Fulton County is responsible for, among other things, the supervision, maintenance and operation of the District Attorney, Sheriff, and Fulton County Jail. As set forth in the Fulton County Code of Ordinances, Fulton County, through recommendations of the Fulton County Justice System Coordinating Committee ("Committee"), implements a countywide justice plan. The Committee makes recommendations to the Fulton County Board of Commissioners, which takes action to implement the plan, making it the official policy of Fulton County. Among the

---

[1] Defendants Turner, Moss, Finley, Shields, Glazier, Aguinaga, Codrington, and Strom will be referred to collectively hereafter as the "APD Defendants"

agencies invited to have representatives on the Committee are the Fulton County District Attorney, Fulton County Sheriff and City of Atlanta. Pursuant to Fulton County's justice plan and other policies, and with the express approval and consent of Fulton County, the Fulton County District Attorney, Paul Howard, has established a "Complaint Room" to initially investigate and charge criminal cases. According to the Fulton County District Attorney, this "front-end case-screening system [] has reduced the time required to formally charge defendants from several weeks to under one hour . . . ."[2] Fulton County's use of the Complaint Room to screen criminal cases encourages, promotes and rewards expedited, but inaccurate and factually unsupported prosecutions, including Plaintiff's prosecution. Fulton County's use of the Complaint Room to screen cases removes the judge from the process of establishing that probable cause for a search or arrest of an individual exists and, therefore, leads to the search, arrest and prosecution of individuals when no probable cause exists. Fulton County's use of the Complaint Room, its justice plan and other official policies, practices and customs were a moving force in the constitutional and statutory violations set forth herein.

16.

At all times relevant to this action, Defendant Theodore Jackson ("T. Jackson") was the duly elected Sheriff of Fulton County, Georgia[3] and employed by Fulton County. At all times material to this action, T. Jackson had ultimate responsibility for the hiring, training, supervision and/or firing responsibilities over the Deputy Sheriffs and other employees of the Sheriff who are defendants in this action. T. Jackson is responsible and liable for the actions or omissions of the employees of the Sheriff named as defendants in this action. He is sued in his individual capacity. At all times relevant to this action, T. Jackson was acting under color of state law.

---

[2] See Fulton County District Attorney's website, *http://www.atlantada.org/meettheda*, last accessed on March 5, 2012

[3] The Sheriff supervises, operates and maintains the Fulton County Jail.

17.

At all times relevant to this action, Defendant, Lenore Vanderpool ("Vanderpool") was employed by Fulton County as a Sergeant with the Sheriff and acting in her role as a Sheriff's employee. At all times relevant to this action, Vanderpool was responsible for the hiring, training, supervision, and/or firing of Deputy Sheriffs and other employees of the Sheriff who are defendants in this case. At all times relevant to this action, Vanderpool was responsible for, among other things, investigating inmate claims of innocence, including Plaintiff's. Vanderpool is responsible and liable for the actions or omissions of the employees of the Sheriff named as defendants in this action. She is sued in her individual capacity. At all times relevant to this action, Vanderpool was acting under color of state law. Vanderpool was served with a copy of the Summons and Complaint on May 30, 2012.

18.

At all times relevant to this action, Defendant, Sharon Jackson ("Jackson") was employed by the Sheriff as a Deputy Sheriff and acting in her role as a Sheriff's employee. At all times relevant to this action, Jackson was responsible for, among other things, investigating inmate claims of innocence, including Plaintiff's claims of innocence. She is sued in her individual capacity. At all times relevant to this action, Jackson was acting under color of state law. Jackson was served with a copy of the Summons and Complaint on May 29, 2012.

19.

At all times relevant to this action, Defendant, Ashley Thornton ("Thornton") was employed by the Sheriff as a Deputy Sheriff and acting in her role as a Sheriff's employee. At all times relevant to this action, Thornton was responsible for, among other things, investigating inmate claims of innocence, including Plaintiff's claims of innocence. She is sued in her

individual capacity. At all times relevant to this action. Thornton was acting under color of state law. Thornton was served with a copy of the Summons and Complaint on May 29. 2012.

20.

At all times relevant to this action. Defendant, Vernissa Perry ("Perry") was employed by the Sheriff as a counselor in the Fulton County Jail and acting in her role as a Sheriff's employee. At all times relevant to this action, Perry was responsible for, among other things, investigating inmate claims of innocence, including Plaintiff's claims of innocence. She is sued in her individual capacity. At all times relevant to this action. Perry was acting under color of state law. Perry was served with a copy of the Summons and Complaint on May 30, 2012.[4]

21.

At all times relevant to this action. Defendant Paul L. Howard. Jr. ("Howard") was employed by Fulton County as the Fulton County District Attorney. At all times relevant to this action, Howard had ultimate responsibility for the investigation and prosecution of felony criminal matters on behalf of Fulton County, including the charging, accusation, indictment, pre-charging investigation, and dismissal of criminal complaints against defendants. At all times relevant to this action, Howard had ultimately responsibility for the hiring, training, supervision and/or firing of Assistant District Attorneys, investigators, victim-witness advocates, and other employees working for the District Attorney. Howard is directly responsible and liable for the actions or omissions of the employees of the District Attorney, including those employees named as defendants in this action. At all times relevant to this action, a portion of Howard's salary was paid by Fulton County, and Howard personally participated in the investigation of Plaintiff and Plaintiff's prosecution. Howard, on behalf of Fulton County, personally established and

---

[4] Defendants T. Jackson, Vanderpool, Jackson, Thornton and Perry will be collectively referred to hereafter as the "Sheriff Defendants"

implemented Fulton County's policy, practice and custom of using the "Complaint Room" to initially investigate and charge cases against defendants in Fulton County. At all times relevant to this action, Howard personally supervised the Fulton County District Attorney's Victim-Witness Assistance Program and Complaint Room and, upon information and belief, Howard personally participated in implementing and enforcing Fulton County's justice plan. He is sued in his individual capacity. At all times relevant to this action, Howard was acting under color of law. Howard was served with a copy of the Summons and Complaint on May 30, 2012.

22.

At all times relevant to this action, Defendant Stephen Putnam ("Putnam") was employed as an assistant district attorney with the District Attorney and acting in his role as an employee of the District Attorney in the Complaint Room. At all time relevant to this action, Putnam was responsible for the investigation and prosecution of felony criminal matters on behalf of Fulton County, Georgia, including the charging, accusation, indictment, investigation, and dismissal of criminal complaints against Defendants. At all times relevant to this action, Putnam was responsible for the training and/or supervision of investigators, victim-witness advocates, and other employees working for the District Attorney. Putnam is responsible and liable for the actions or omissions of the employees of the District Attorney named as defendants in this action. He is sued in his individual capacity. At all times relevant to this action, Putnam was acting under color of law. Putnam was served with a copy of the Summons and Complaint on May 30, 2012.

23.

At all times relevant to this action, Defendant Waverly Settles ("Settles") was employed as an assistant district attorney with the District Attorney, and acting in his role as an employee

- 12 -

of the District Attorney. At all time relevant to this action, Settles was responsible for the investigation and prosecution of felony criminal matters on behalf of Fulton County, Georgia, including the charging, accusation, indictment, investigation, and dismissal of criminal complaints against Defendants. At all times relevant to this action, Settles was responsible for the training and/or supervision of investigators, victim-witness advocates, and other employees working for the District Attorney. Settles is responsible and liable for the actions or omissions of the employees of the District Attorney named as defendants in this action. He is sued in his individual capacity. At all times relevant to this action, Settles was acting under color of law. Settles was served with a copy of the Summons and Complaint on May 30, 2012.

24.

At all times relevant to this action, Defendant Rebecca Keel ("Keel") was employed as an assistant district attorney with the District Attorney and acting in her role as an employee of the District Attorney.[5] At all time relevant to this action, Keel was responsible for the investigation and prosecution of felony criminal matters on behalf of Fulton County, Georgia, including the charging, accusation, indictment, investigation, and dismissal of criminal complaints against Defendants. At all times relevant to this action, Keel was responsible for the training and/or supervision of assistant district attorneys, investigators, victim-witness advocates, and other employees working for the District Attorney. Keel is responsible and liable for the actions or omissions of the employees of the District Attorney named as defendants in this action. She is sued in her individual capacity. At all times relevant to this action, Keel was acting under color of law. Keel was served with a copy of the Summons and Complaint on May 30, 2012.

---

[5] Due to a typographical error, Keel was incorrectly identified as "Rebecca Keels" in the style of the Complaint.

25.

At all times relevant to this action, Defendant Melanie Davis ("Davis") was employed as an assistant district attorney with the District Attorney and acting in her role as an employee of the District Attorney. At all time relevant to this action, Davis was responsible for the investigation and prosecution of felony criminal matters on behalf of Fulton County, Georgia, including the charging, accusation, indictment, investigation, and dismissal of criminal complaints against Defendants. At all times relevant to this action, Davis was responsible for the training and/or supervision of assistant district attorneys, investigators, victim-witness advocates, and other employees working for the District Attorney. Davis is responsible and liable for the actions or omissions of the employees of the District Attorney named as defendants in this action. She is sued in her individual capacity. At all times relevant to this action, Davis was acting under color of law. Davis was served with a copy of the Summons and Complaint on May 30, 2012.

26.

At all times relevant to this action, Defendant Arthur Walton ("Walton") was employed as an assistant district attorney with the District Attorney and acting in his role as an employee of the District Attorney. At all time relevant to this action, Walton was responsible for the investigation and prosecution of felony criminal matters on behalf of Fulton County, Georgia, including the charging, accusation, indictment, investigation, and dismissal of criminal complaints against Defendants. At all times relevant to this action, Walton was responsible for the training and/or supervision of investigators, victim-witness advocates, and other employees working for the District Attorney. Walton is responsible and liable for the actions or omissions of the employees of the District Attorney named as defendants in this action. He is sued in his

- 14 -

individual capacity. At all times relevant to this action. Walton was acting under color of law. Walton was served with a copy of the Summons and Complaint on May 30, 2012.

27.

At all times relevant to this action, Defendant Wesley Vann ("Vann") was employed as a victim-witness advocate with the District Attorney and acting in his role as employee of the District Attorney. At all time relevant to this action, Vann was responsible for criminal case investigation and communicating with victims and witnesses and for properly and timely communicating with assistant district attorneys and other employees concerning communication with victims and witnesses. He is sued in her/his individual capacity. At all times relevant to this action, Vann was acting under color of law. Vann was served with a copy of the Summons and Complaint on May 30, 2012.

28.

At all times relevant to this action, Defendant Jamie Wilson ("Wilson") was employed as a victim-witness advocate with the District Attorney and acting in her role as an employee of the District Attorney. At all time relevant to this action, Wilson was responsible for criminal case investigation and communicating with victims and witnesses and for properly and timely communicating with assistant district attorneys and other employees concerning communication with victims and witnesses. She is sued in her individual capacity. At all times relevant to this action, Wilson was acting under color of law. Wilson was served with a copy of the Summons and Complaint on May 30, 2012.

29.

At all times relevant to this action, Defendant Felicia Deas ("Deas") was employed as a victim-witness advocate with the District Attorney and acting in her role as an employee of the

District Attorney. At all time relevant to this action, Deas was responsible for criminal case investigation and communicating with victims and witnesses and for properly and timely communicating with assistant district attorneys and other employees concerning communication with victims and witnesses. She is sued in her individual capacity. At all times relevant to this action, Deas was acting under color of law. Deas was served with a copy of the Summons and Complaint on May 30, 2012.[6]

## JURISDICTION AND VENUE

30.

This Court has jurisdiction over the subject matter of this dispute.

31.

Venue in this action is proper in this Court because at least one Defendant resides in Fulton County, Georgia, all Defendants reside in Georgia, and because a substantial pare of the events or omissions giving rise to the claims set forth in this Complaint occurred within Fulton County, Georgia.

32.

This action is brought for monetary damages and declaratory and injunctive relief and other appropriate relief including, but not limited to, attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, Article I, Section I, ¶¶ I, VII, XIII, and XXVIII of the Georgia Constitution, O.C.G.A. §§ 51-7-1, 51-7-20 and 51-7-40 and Georgia common law.

---

[6] Defendants Howard, Putnam, Settles, Keel, Davis, Walton, Vann, Wilson and Deas will be referred to collectively hereafter as the "District Attorney Defendants".

33.

On October 21, 2011, pursuant to Georgia's *ante litem* statute, O.C.G.A. § 36-33-5, Plaintiff provided the City with notice of her allegations by letter sent by certified to mail to Kasim Reed, the Mayor of Atlanta, and the Council of the City of Atlanta. The City acknowledged receipt of Plaintiff's *ante litem* notice by letter on November 15, 2011 and assigned it claim number 111.0835. Because thirty days have passed from the presentation of such claim to the City of Atlanta and the City of Atlanta has not acted upon it, *see* O.C.G.A. § 36-33-5(b) and (c), Plaintiff now files her First Amended Complaint for damages against the City.

34.

On August 21, 2011, pursuant to Georgia's *ante litem* statute, O.C.G.A. § 36-11-1, Plaintiff provided Fulton County with notice of her allegations by letter sent by certified mail to the John Eaves, the Chairman of the Fulton County Board of Commissioners. Fulton County acknowledged receipt of Plaintiff's *ante litem* notice by letter on November 16, 2011. Because thirty days have passed from the presentation of such claim to Fulton County and Fulton County has not acted upon it, *see* O.C.G.A. § 36-11-1, Plaintiff now files her First Amended Complaint for damages against Fulton County.

35.

On April 13, 2012, pursuant to Georgia's Tort Claims Act, O.C.G.A. § 50-21-26, Plaintiff provided the State of Georgia with notice of her allegations by letter sent by certified to mail to Ms. Lisa Pratt, Director of Risk Management Services, Samuel Olens, Esq., Attorney General, Paul L. Howard, Jr., Esq., Fulton County District Attorney, and Sheriff Theodore Jackson, Fulton County Sheriff. The State of Georgia responded to Plaintiff's notice by stating

that the District Attorney Defendants and Sheriff Defendants were not state actors in connection with Plaintiff's arrest, prosecution and incarceration as claimed.

## FACTUAL BACKGROUND

### APD's FALSE AND UNLAWFUL ARREST AND DETENTION OF PLAINTIFF

36.

On the morning of August 21, 2011, Plaintiff telephoned APD 911 to report that her vehicle had been stolen. Plaintiff provided her telephone number to the APD 911 operator, and the number was logged into the CAD Report for this incident.

37.

Officer Codrington was dispatched and traveled to Plaintiff's residence located at 1456 Hawkins Street in Atlanta, Georgia. Plaintiff identified the person who had taken her vehicle. During this encounter with Codrington, Plaintiff provided Codrington with her identifying information. Codrington told Plaintiff that he would place the report orally over the police radio, but that he would not take a written statement from Plaintiff or complete or file an incident report.

38.

Codrington never completed a written incident report of Plaintiff's complaint.

39.

Had Codrington completed an incident report for Plaintiff's complaint, he would have had the vital information he needed concerning Ms. Culpepper, which would have assisted tremendously in the confirmation of her identity.

- 18 -

40.

At or about 9:56 a.m., Plaintiff called APD 911 again to advise that the person who she believed had taken the vehicle had come to her house but he did not have her vehicle. Plaintiff provided APD 911 with a description of the suspect and his clothing.

41.

Following this call, Codrington traveled to interview Plaintiff again. Codrington was accompanied by another APD officer, who was in a separate police vehicle. Plaintiff explained to Codrington that the person who had taken her vehicle had fled. Codrington told Plaintiff that he and his partner would be on the lookout for the vehicle.

42.

At roughly 9:45 a.m. on August 21, 2011, Angelo Boyd ("Boyd") drove to Teresa Gilbert's ("Gilbert") residence located at 962 Ashby Circle in Atlanta. Boyd became involved in a dispute with Gilbert, his ex-girlfriend, whom he had known for several years, and while he was working under the hood of her car, she poured boiling water on him. No employee of APD, including Codrington, was present at the scene of the crime or was a witness to the alleged crime.

43.

Boyd then drove himself to the Emergency Room at South Fulton Medical Center ("SFMC"). On the way to SFMC, Boyd called APD 911.

44.

Boyd provided the APD 911 operator with Gilbert's telephone number. The 911 operator confirmed at that time the number was registered to Andy Gilbert, who Boyd confirmed was Gilbert's mother. Based on the telephone number, the 911 operator confirmed the location of the

- 19 -

crime scene as 962 Ashby Circle, Atlanta, Georgia, and advised Boyd to give that information to the individuals at SFMC.

45.

At or about 10:47 a.m., Officer Johnson, a security officer for SFMC, called APD 911 to report that Boyd had been admitted with severe burns resulting from an assault at 964 Ashby Circle.

46.

At or about 10:51 a.m., APD CID investigator, Strom, made contact with APD patrol officer Aguinaga requesting that she send a marked unit to 964 Ashby Circle to look for the suspect, Gilbert. Strom described Gilbert as a black female, 41 years old, with a wrapped hairdo in a bun. He noted Gilbert had a gold tooth and was wearing a blue jean dress. At that time, Aguinaga requested that APD patrol officer Codrington go to the scene.

47.

Codrington did not travel to 964 Ashby Circle in Atlanta on August 21, 2011.

48.

Codrington did not travel to 962 Ashby Circle in Atlanta on August 21, 2011.

49.

Instead, Codrington traveled to Plaintiff's residence located at 1456 Hawkins Street in Atlanta. On August 21, 2011, Codrington knew Plaintiff lived at the 1456 Hawkins Street.

50.

1456 Hawkins Street is roughly 1.2 miles from 962 Ashby Circle.

51.

Plaintiff saw Codrington arrive at her home, and believing he was there to update her

regarding her case, went out to meet him in the front yard.

52.

Walking towards Plaintiff, Codrington then told her to put her hands behind her back, he placed physical restraints on her wrists, and told her she was being arrested for pouring boiling water on Angelo Boyd.

53.

Codrington was not assisted or accompanied by a female officer during the arrest.

54.

Before Codrington placed Plaintiff in the back of his police vehicle, Plaintiff's pockets were emptied. Since her hands were restrained behind her back, a male acquaintance of Plaintiff's had to reach into her pockets, from which he retrieved Plaintiff's driver's license and cell phone.

55.

At no time during Plaintiff's arrest did Codrington inspect or ask to inspect Plaintiff's driver's license or cell phone or ask her what her phone number was.

56.

At the time of her arrest on August 21, 2011, Plaintiff did not have a gold tooth.

57.

At the time of her arrest on August 21, 2011, Plaintiff's hair was not in a bun.

58.

At the time of her arrest on August 21, 2011, Plaintiff was not wearing a blue jean dress.

59.

Plaintiff's birthdate is January 16, 1965.

- 21 -

60.

At the time of her arrest on August 21, 2011, Plaintiff had her driver's license on her person.

61.

At the time her of her arrest on August 21, 2011, Plaintiff's driver's license indicated that Plaintiff's birthdate was January 16, 1965.

62.

At the time her of her arrest on August 21, 2011, Codrington knew Plaintiff's birthdate was January 16, 1965.

63.

At the time of her arrest on August 21, 2011, Plaintiff was 5'6" tall.

64.

At the time of her arrest on August 21, 2011, Plaintiff's driver's license indicated Plaintiff was 5'6" tall.

65.

At the time of her arrest on August 21, 2011, Codrington knew Plaintiff was 5'6" tall.

66.

Plaintiff has never used the alias "Teresa Gilbert."

67.

At the time of her arrest on August 21, 2011, Plaintiff did not weigh 140 lbs.

68.

At the time of her arrest on August 21, 2011, Codrington knew Plaintiff did not weigh 140 lbs.

- 22 -

69.

On August 21, 2011, no APD employee ever warned or otherwise advised Plaintiff of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

70.

At or near the time of Plaintiff's arrest on August 21, 2011, Codrington conducted or had conducted a search of Plaintiff outside her home and without a search warrant.

71.

On August 21, 2011, Codrington arrested Plaintiff at her home without an arrest warrant.

72.

At the time of her arrest on August 21, 2011, Plaintiff asked Codrington what she was being arrested for. She told Codrington that she did not know what he was talking about, did not know Boyd and denied that she had in any way harmed Boyd.

73.

At the time of her arrest on August 21, 2011, witnesses at Plaintiff's home told Codrington that Plaintiff had been at home all morning. Codrington did not obtain written statements from any of these alibi witnesses, and neither Aguinaga nor Strom performed any follow-up interviews with these witnesses.

74.

On August 21, 2011, within thirty minutes of receiving the radio call from Strom, Aguinaga radioed Codrington to ask whether he had been to Ashby Circle. Codrington advised that he was on Hawkins Street because he had responded to a call from "Teresa" earlier that morning.

- 23 -

75.

At or about 10:52 a.m., Ludwig requested that Aguinaga travel to SFMC to interview Boyd.

76.

At or about 11:35 a.m., Aguinaga radioed Ludwig to report that Aguinaga was with Boyd and that Boyd was reporting his ex-girlfriend had committed the crime. During this communication, Aguinaga advised Ludwig that according to Boyd the alleged suspect was still at the Ashby Circle location.

77.

During the interview of Boyd by Aguinaga at South Fulton Medical Center, Boyd told Aguinaga that Gilbert did not live on Hawkins Street. Boyd advised Aguinaga that Gilbert's birthday was on April Fool's Day. In addition to giving the 911 Operator Gilbert's phone number, Boyd also gave the number to Aguinaga at SFMC. Aguinaga reported that according to Boyd, there were two vehicles involved, Boyd's truck and Gilbert's car. Ludwig advised Aguinaga to contact APD's CID unit, but Ludwig believed the charge would be aggravated assault.

78.

While at SFMC, Aguinaga performed a search for Teresa Gilbert electronically through the National Crime Information Center ("NCIC"), and confirmed various aspects of Ms. Gilbert's identity and the location of her residence.

79.

A few minutes later, Aguinaga radioed Strom and conveyed certain information obtained from Boyd during her interview. During this radio transmission, Strom asked Aguinaga whether

- 24 -

Boyd knew the suspect's name and birthdate. Aguinaga told Strom the suspect's name was "Teresa Gilbert", she was 41 years old and lived at 964 Ashby Circle. Aguinaga reported that Gilbert was Boyd's ex-girlfriend. Aguinaga explained that Gilbert should still be at the scene of the crime if Strom wanted to send a unit over there. Strom indicated that he would go to the main police radio channel and send someone over to the scene.

80.

Strom also asked Aguinaga for a description of Gilbert. Aguinaga advised that Gilbert was 5'9" tall, weighed 140 pounds, had a gold tooth on the left side of her mouth and when Boyd last saw her, she was wearing a blue jean dress. Strom advised Aguinaga to stay with Boyd, that he (Strom) wanted to see if Gilbert was still at the scene, and that he would try to corroborate the stories.

81.

Less than ten minutes later, Strom radioed Codrington, who explained that he had received a call from "her" earlier that day. Codrington indicated that her boyfriend had taken her car and returned without the car, and the boyfriend took off running with Teresa chasing after him. At that time, Strom told Codrington that they were getting a "completely different" story from Boyd.

82.

Strom advised Codrington to swing by the scene to see if he could locate the suspect. This was the second time Codrington had been asked to go to the crime scene.

83.

Strom asked Codrington whether he had a date of birth for the suspect. Codrington said he did not, but would get one when he saw her.

- 25 -

84.

Prior to October 12, 2011, Codrington did not provide Plaintiff's birthdate to Strom or Aguinaga.

85.

Prior to October 12, 2011, Codrington did not provide Plaintiff's full name to Strom, Aguinaga or Ludwig.

86.

Prior to October 12, 2011, Codrington did not provide Plaintiff's social security number to Strom, Aguinaga or Ludwig.

87.

Prior to October 12, 2011, Codrington did not provide Plaintiff's height to Strom, Aguinaga or Ludwig.

88.

Prior to October 12, 2011, Codrington did not provide Plaintiff's weight to Strom or Aguinaga.

89.

Prior to October 12, 2011, no APD employee attempted to call Gilbert's phone.

90.

Prior to October 12, 2011, no APD employee interviewed any witnesses at or near 962 Ashby Circle.

91.

After her radio communication with Strom, Aguinaga radioed Codrington to advise that the correct address was 962 Ashby Circle, that Ms. Gilbert should still be there walking around,

and to ask whether Codrington had found the suspect yet. Codrington advised that he was on Martin Luther King, Jr. Blvd.. and that the address he responded to earlier in the morning was not Ashby, but over off Chappell Road. Codrington told Aguinaga that he had responded to 1456 Hawkins twice earlier in the day. He told Aguinaga he was going to travel to Hawkins Street first to see if she was still there.

92.

Shortly after this communication. Strom spoke with Aguinaga to again inquire about Gilbert's date of birth. Aguinaga told Strom that Gilbert's birthdate was April 1, 1969. She also advised Strom that Codrington told her that he had been to the Hawkins Street location twice that day so he was going to check over there first and if she was not there, he was going to check the 962 Ashby Circle location. Strom advised that if Codrington did not get her, they would take out a warrant for her.

93.

Prior to October 12, 2011, Strom did not convey Gilbert's birthdate to Codrington.

94.

Prior to October 12, 2011, Strom did not attempt to match Gilbert's birthdate with Plaintiff's birthdate.

95.

Prior to October 12, 2011, no APD employee requested or ordered that Plaintiff be taken to SFMC.

96.

Prior to October 12, 2011, no APD employee showed or attempted to show Boyd a photo of Plaintiff.

- 27 -

97.

Prior to October 12, 2011, Strom, Aguinaga, Codrington e did not attempt to verify that the birthdates or other information for Plaintiff and Gilbert matched.

98.

Around noon on August 21, 2011, Strom asked Aguinaga to fill out a witness-victim statement and have the APD ID unit go to SFMC to photograph Boyd's injuries.

99.

At or about 12:17 p.m. on August 21, 2011, Codrington radioed Aguinaga, stating, "Where you at, I got your girl?" Aguinaga told Codrington she wanted to make contact with Strom about what to do next. Strom overheard the conversation and stated:

> I hear all that, Codrington, if you can just write up the ticket for
> agg assault for Aguinaga, just go ahead and ship her to Fulton
> [County Jail]. I don't need to talk to her. From what I hear from
> Aguinaga, we've got enough.   Just ship her to Fulton for agg
> assault, we'll be good.

100.

At or about 12:33 p.m. on August 21, 2011, Aguinaga and Codrington spoke again over the police radio. Codrington asked Aguinaga to confirm that the incident occurred on Hawkins Street. Aguinaga advised that as far as she knew from her interview with Boyd, the incident occurred on Ashby Circle. Codrington stated, "Well, if it's at her house, it's 1456 Hawkins Street." Despite Boyd's statements to Aguinaga that he had been at the Ashby Circle address that morning, Codrington simply dismissed the address.

101.

Aguinaga also asked Codrington about Gilbert's vehicle because Boyd indicated that he had been putting water in it at the time the incident occurred.  Codrington told Aguinaga that Plaintiff did not know where the vehicle was.

102.

In his communications with Aguinaga on August 21, 2011, Boyd did not report any vehicle being stolen, and Aguinaga never asked him about any vehicle allegedly being stolen.

103.

Aguinaga then told Codrington to, "just put the incident location as 962 Ashhy Circle." Codrington then stated:

> Well, they both got a room over here at 1456 Hawkins.  This is
> where she claims she lives and where I picked her up from.  That's
> where she claims she lives.

104.

At roughly 12:43 p.m. on August 21, 2011, Strom radioed Codrington to inquire where he was.  Codrington advised that he was at Joseph E. Boone Boulevard and Chappell Road. Upon information and belief, Codrington was parked in the parking lot of a local store in Plaintiff's neighborhood with Plaintiff in the backseat of his police vehicle.

105.

Codrington and Aguinaga then engaged in the following discussion over the Zone 1 surveillance radio, which Strom overheard:

> **Codrington:**  You know, she's claiming a totally different story.
> Everyone in the house is claiming she never left....but I'm going to
> go along with what you need me to do.  She hasn't done such a
> thing and what not.  Just wanted to advise you of that.

**Aguinaga:**  What is she saying about how he got the burns on him?

**Codrington:**  The story she says about how he got the marks has nothing to do with anything relevant.

**Aguinaga:**  Is she aware he has third degree burns from her pouring hot water on him?

**Codrington:**  She says when he left this morning, there was nothing wrong with him.

**Aguinaga:**  Well, as of right now, the story I got from him and all the information, advise her she's going to have to explain it to the judge.

**Codrington:**  Yeah, I figured that. Her story is so far from yours....her story is all over the place and has nothing to do with anything we need to know....I'm just going to handle this the way I was in the beginning.

**Aguinaga**:  Yeah, I got that.

106.

Strom did not intervene or question the validity of Codrington's identification, did not

otherwise seek to confirm that Codrington had arrested the correct person, and did not perform

any further investigation.

107.

Plaintiff's arrest citation states that Aguinaga was the arresting officer.

108.

Codrington never completed any supplemental reports regarding his involvement in

Plaintiff's arrest and transport to the Fulton County Jail.

109.

At or about 1:13 p.m., Aguinaga advised another APD employee that APD Identification

Unit had traveled to SFMC, had taken pictures of Boyd's injuries, and that Aguinaga had already

- 30 -

contacted the District Attorney's Complaint Room to advise them what she had. Aguinaga asked this APD employee to ask if Strom needed anything else from her. This employee advised, "We're good. You're good. Great job."

110.

At or about 1:13 p.m., Aguinaga advised another APD employee that APD Identification Unit had traveled to SFMC, had taken pictures of Boyd's injuries, and that Aguinaga had already contacted the District Attorney's Complaint Room to advise them what she had. Aguinaga asked this APD employee to ask if Strom needed anything else from her. This employee advised, "We're good. You're good. Great job."

111.

In the afternoon on August 21, 2011, but prior to Plaintiff being charged with any crime, Aguinaga faxed a copy of her incident report and Plaintiff's arrest citation to Defendant Stephen Putnam in the Fulton County District Attorney's Complaint Room.

112.

In the afternoon on August 21, 2011, but prior to Plaintiff being charged with any crime, Aguinaga spoke with Putnam by telephone on several occasions.

113.

During her first discussion with Putnam on August 21, 2011, and prior to Plaintiff being charged with any crime, both Putnam and Aguinaga noted discrepancies between the names and birthdates contained on the incident report and arrest citation. During this conversation, Putnam told Aguinaga that it appeared that the person Codrington arrested might have given a false name and birthdate. Aguinaga then attempted to call Codrington on his cell phone, but she was not able to reach him. Aguinaga left Codrington a voicemail to call her back as soon as possible.

114.

Aguinaga then called Putnam again to tell him that she had left a message with Codrington. During this second call, Putnam asked her if Plaintiff had been transported to the jail and Aguinaga told Putnam that she had been transported to the jail. Putnam told Aguinaga he would review everything and call her back.

115.

Putnam called Aguinaga back and told her that the District Attorney was going to use the name written on the arrest citation Teresa Culpepper because she had already been transported to the jail. Aguinaga told Putnam she was not going to make any changes to her incident report to reflect the suspect's name as Teresa Culpepper because the information in the incident report was provided by Boyd. Putnam then told Aguinaga that he was going to make changes on "his" end.

116.

Aguinaga made no changes to any of the information concerning Plaintiff contained in the incident report.

117.

Aguinaga did not notify any supervisor concerning the discrepancies in the information concerning Plaintiff and Gilbert.

118.

As the primary police officer handling Boyd's complaint, Aguinaga never made contact with Plaintiff or Gilbert.

119.

Some time after August 21, 2011, Detective Scott in the Zone 1 precinct asked Boyd to come into the precinct, at which time he showed Boyd a photograph of Gilbert. Boyd then immediately identified her as the woman who had poured boiling water on him. This was the first time anyone had ever asked Boyd to identify Gilbert.

120.

On August 21, 2011, Plaintiff was transported by Codrington to the Fulton County Jail, where she remained incarcerated until October 12, 2011.

121.

Plaintiff was searched without a valid search warrant.

122.

Plaintiff was arrested without a valid arrest warrant.

123.

No APD employee contacted a judge or brought Plaintiff before a judge for a probable cause determination.

### CRIMINAL INVESTIGATION AND PROSECUTION OF PLAINTIFF BY THE FULTON COUNTY DISTRICT ATTORNEY

124.

Defendant Putnam initially investigated and screened Plaintiff's case in the District Attorney's "Complaint Room" on August 21, 2011. At that time, and solely in his role as a factual investigator, he recognized discrepancies in both the name and birthdate for Gilbert and Plaintiff.

125.

According to the District Attorney's website, "[o]nce it is determined that a criminal case

- 33 -

warrants further investigation by the District Attorney's Office, the Screening and Charging Division is responsible for screening cases to assess if prosecution is warranted."[7]

126.

The District Attorney's website also states, "[a]ttorneys are responsible for determining the charges (whether by indictment or accusation) and determining what further information is needed to successfully prosecute the case."[8]

127.

The District Attorney maintains an electronic case file management system called ProDialogue, in which attorneys and other employees of the District Attorney, including the Defendants in this case, may input cases notes electronically and which are available for viewing by anyone involved in investigating or prosecuting the case.

128.

ProDialogue contains several subpages for data entry, which include sections related to the initial investigation of a criminal ease such as contact and interviews with the victim and witnesses, conversations with police and other officials, and other data pertaining to the case.

129.

The ProDialogue notes for Plaintiff's case contain notations from Putnam indicating that, in the course of his investigation of Plaintiff as a suspect on August 21, 2011, and prior to Putnam making any decision to prosecute or charge Plaintiff, Putnam made contact with Aguinaga who told him she had spoken with the arresting officer, and the arresting officer told

---

[7] http://www.atlantada.org/officeoverview/criminalintake/chargingscreening/index.htm (last accessed March 5, 2012)
[8] http://www.atlantada.org/officeoverview/criminalintake/chargingscreening/index.htm (last accessed on March 5, 2012)

- 34 -

her that Plaintiff's clothing matched that of the alleged suspect and she admitted seeing the victim. This information was false.

130.

In the course of his investigation of Plaintiff as a suspect on August 21, 2011, and prior to Putnam making any decision to prosecute or charge Plaintiff. Putnam wrote, "the officer is confident that the person arrested is the person that committed the act . . . ." Putnam also noted that the officer "made multi[sic] attempts to contact arresting officer and also contact the jail to confirm some facts."

131.

During his investigation of Plaintiff as a suspect on August 21, 2011, and prior to Putnam making any decision to prosecute or charge Plaintiff, Putnam indicated, "[t]he officer is confident that the person arrested is the person that committed the acts and after talking to her I believe that Gilbert is an alias."

132.

At or about 3:25 p.m. on August 21, 2011, prior to Putnam making any decision to prosecute or charge Plaintiff, and in the course of his investigation of Plaintiff as a suspect, Putnam performed an electronic search of Plaintiff's criminal history through the Georgia Crime Information Center ("GCIC").

133.

Upon information and belief, on August 21, 2011, prior to Putnam making any decision to prosecute or charge Plaintiff, and in the course of his investigation of Plaintiff as a suspect, Putnam drafted Aguinaga's "Statement of Witness", which reads, "[o]n the above stated date and location. ANGELO BOYD was helping TERESA CULPEPPER, known to the victim as

- 35 -

TERESA GILBERT, with her vehicle[]" and sent it to Aguinaga for signature.⁹ Upon information and belief, Aguinaga signed this statement under oath and penalty of perjury even though Boyd had never told her "Gilbert" was an alias, she had no reason to believe "Gilbert" was an alias, and she had no factual basis for believing "Gilbert" was an alias.

134.

The sole factual basis for the statement, "known to the victim as TERESA GILBERT," contained in the "Statement of Witness" was Putnam's personal investigation and search of the GCIC database, which was performed prior to Putnam making any decision to prosecute or charge Plaintiff, and in the course of his investigation of Plaintiff as a suspect.

135.

On August 21, 2011 Defendant Keel was responsible for: (1) supervising Putnam in the Complaint Room; (2) ensuring a proper investigation prior to Plaintiff being charged with any crime and; (3) preparing the charging documents in Plaintiff's case. Defendant Davis handled Plaintiff's case prior to Plaintiff's indictment.

136.

Between August 22, 2011 and October 12, 2011, Putnam, Keel and Davis never inquired to Boyd, the arresting officers or any employees or agents of the District Attorney as to: (1) the true identity of the suspect; (2) the facts surrounding Plaintiff's arrest; or (3) or whether the information provided by APD was accurate.

137.

The District Attorney's website notes,

> Under the 'Victims Bill of Rights,' the District Attorney's Office is required to provide notification and other basic services to crime victims. Prosecutors are responsible for informing victims of all

---

⁹ A true and correct copy of the "Statement of Witness" is attached hereto as Exhibit "A"

court dates as well as the status of a case from the time of the
initial charging decision to final disposition.[10]

138.

Per the policy of the District Attorney, the Victim-Witness Assistance Program staff are
required, within twelve (12) hours of arrest, to make initial contact with the victim.

139.

On August 24, 2011, three (3) days after Plaintiff's arrest, Defendant Wilson sent a letter
to Boyd. Her letter noted the style of Plaintiff's criminal case as **"State of Georgia vs.
TERESA CULPEPPER"** and indicated that the case was scheduled for presentment to the
Grand Jury on August 26, 2011 and for the All Purpose Calendar on September 5, 2011.

140.

Shortly after his receipt of this letter, Boyd called the District Attorney's office and spoke
with a representative of the District Attorney. During this call, he informed the employee that
the District Attorney had the wrong person in custody in connection with his August 21, 2011
complaint.

141.

In a subpoena dated August 21, 2011, Aguinaga was required to appear at court on
August 26, 2011 to testify before the Grand Jury. Upon information and belief, Officer
Aguinaga failed to appear in court, and the case was not presented to the Grand Jury until
September 2, 2011.

---

[10] *http://www.atlantada.org.officeoverview/prosecutionsupport/victimwitness/index.htm* (last accessed on March 5,
2012). Copies of the printouts of the website subpages for the Fulton County District Attorney are attached
collectively hereto as Exhibit "B".

142.

Upon information and belief, Defendant Settles questioned Aguinaga during presentment of the case to the Fulton County Grand Jury on September 2, 2011. Aguinaga indicated in her sworn statement to APD's Office of Professional Standards that she "just presented the facts of the case and stated in my facts that I was given and that the arrested subject told Officer Codrington a different name than I was given at the hospital."

143.

Upon information and belief, per the policy of Defendant Howard and the District Attorney, the Grand Jury Proceedings on September 2, 2011 were not transcribed.

144.

Upon information and belief, there is no written record of any of the testimony provided during those proceedings.

145.

Upon information and belief, Settles did not independently question or investigate APD's identification of Plaintiff, follow up on Defendant Putnam's file notes, or speak with or interview Boyd prior to the Grand Jury proceedings on September 2, 2011.

146.

On September 7, 2011, Defendant Vann spoke by telephone with Boyd.

147.

During the September 7, 2011 call, Boyd told Vann that the District Attorney had the wrong name in the system and that he had recently seen the correct suspect, Gilbert, walking the streets.

- 38 -

148.

During the September 7, 2011 call, Vann reviewed the APD's statements with Boyd, and Boyd told Vann that he has known the defendant for years as "Gilbert", not "Culpepper".

149.

There are no electronic notes documenting that Vann provided the information obtained from Boyd to any other employee of the District Attorney, that Vann contacted APD to inquire further as to facts surrounding the arrest, or made any effort to arrange a line-up or show-up to make a positive identification of Plaintiff.

150.

Undated handwritten notes on the "Narrative" page of the Incident Report for Incident No. 112330859 in the District Attorney's file for Plaintiff state, "Mel—accused said it wasn't she. He was already like that. I didn't do that to him. Short [woman] wearing jean outfit in her 40's hair in bun. Came from victim." The words "Teresa Gilbert" and "1456 Hawkins St. ATL. GA 30318 are highlighted in the "Arrest" portion of the Incident Report along with the handwritten word, "—location". There is a handwritten circle around the height of 5'10" with a handwritten question, "typo?" It is not yet clear who wrote the notes, to whom they were written, or from where the information was obtained. If these notes were intended for Melanie Davis, there is no evidence that she did anything to follow up on these notes or the information provided by Plaintiff exculpating her.

151.

The file folder for the District Attorney's file on Plaintiff included areas for "Motions Hearings", "Log of Evidence", "Witness Contact Information", "Case Preparation", "Victim and

Witness Contact Log", and "Notes". There is no handwriting or notes in any of these areas of the file folder for Plaintiff's case file.

152.

Vann told Boyd during the call on September 7, 2011 that Vann would look into the case and be back in touch with Boyd. Prior to October 5, 2011, Boyd did not receive a phone call or receive any other contact from Vann or anyone else at the District Attorney's office.

153.

Prior to October 12, 2011, Vann did not personally convey the information obtained from Boyd to any other employee of the District Attorney, including any assistant district attorney.

154.

On October 5, 2011, Defendant Deas attempted to contact Boyd by telephone and left him a voicemail.

155.

Between September 8, 2011 and October 4, 2011, no employee of the District Attorney, including any assistant district attorney, reviewed Plaintiff's case materials.

156.

Between September 8, 2011 and October 4, 2011, no employee of the District Attorney, including any assistant district attorney, spoke with Mr. Boyd.

157.

Between September 8, 2011 and October 4, 2011, no employee of the District Attorney, including any assistant district attorney, made any notes on Plaintiff's case.

- 40 -

158.

On October 6, 2011, Plaintiff was brought before Fulton County Superior Court Judge, Henry Newkirk. At that time, Boyd told Defendant Walton and the Court that Plaintiff was not the person who attacked him.

159.

Based on the information provided by Boyd, on October 6, 2011, Walton *nolle prosquied* Plaintiff's felony charge for aggravated battery, but neither he nor anyone else at the District Attorney's office removed from Plaintiff's arrest record the other unindicted charge of misdemeanor battery relating to the same incident. As a result, Plaintiff remained in the custody of the Sheriff.

160.

The District Attorney removed Plaintiff's open, unindicted misdemeanor battery charge on October 12, 2011.

161.

After receiving notification from the District Attorney that the open misdemeanor charge had been removed from Plaintiff's case, the Sheriff released Plaintiff from custody on October 12, 2011

### THE SHERIFF'S INCARCERATION OF PLAINTIFF

162.

On several occasions after she was booked into the Fulton County Jail, Plaintiff told Defendants Jackson and Perry that she was innocent of the charges and asked them to look into why she had been arrested.

163.

Jackson initially told Plaintiff she would have her supervisor, Defendant Vanderpool look into it and get back to her. When Jackson did not get back to Plaintiff, Plaintiff inquired to her again on several occasions.

164.

Over time, Jackson became increasingly annoyed at Plaintiff for asking about her case, and ultimately threatened to charge Plaintiff with escape if she continued to ask for help in demonstrating her innocence.

165.

On September 9, 23, and 29, 2011, Plaintiff also spoke with Perry explaining that she was innocent and asking what she could do to prove it. Perry did not investigate Plaintiff's claims of innocence.

166.

On at least one occasion, Plaintiff also asked Defendant Thornton to inquire about her charges, but Thornton also did not investigate Plaintiff's case or her claims of innocence.

167.

While in the Sheriff's custody, Plaintiff completed several "Inmate Request" forms to inquire about the status of her case, inquire about her charges and bond and also when she would be going to court.

168.

Jackson, Vanderpool, Thornton and Perry never responded to Plaintiff's request to investigate her claims of innocence and never investigated her claims of innocence.

169.

Upon information and belief, in effecting the arrest, prosecution and incarceration of Plaintiff, the APD Defendants, District Attorney Defendants and Sheriff Defendants performed a search related to Plaintiff on APD, District Attorney and Sheriff computers, and in doing so entered Plaintiff's personal information into the computer electronically and checked the information against an information database with the intention of examining personal information about Plaintiff.

### THE POLICIES, PRACTICES AND CUSTOMS OF THE CITY OF ATLANTA

170.

Mayor Kasim Reed is the Chief Executive Officer of the City of Atlanta. Pursuant to the Charter for the City of Atlanta, Mayor Reed, on behalf of the City of Atlanta, executes and enforces the provisions of the Charter and all other laws and exercises supervision over all of the administration of all departments of the City, including APD.

171.

Pursuant to the powers and duties of the Atlanta City Charter, Mayor Reed, on behalf of the City, prescribes, requires, publishes, and implements standards of administrative, management, and operating practices and procedures to be followed and adhered to by all offices and departments, including APD.

172.

The City promulgates and enforces policies, practices and customs for law enforcement for the City.

173.

APD is the law enforcement agency for the City of Atlanta.

174.

According to the City of Atlanta's website, APD is a governmental department of the City that delivers professional police services on behalf of the City.[11]

175.

Defendant Turner, the Chief of Police for APD, reports to the City.

176.

Turner implements and promulgates the City's law enforcement policies, practices and customs.

177.

Through APD, the City has implemented, established and promulgated a policy, practice and custom of using arrest quotas and evaluating the performance of APD officers based, in part, on the number of arrests each officer makes.

178.

The City's quota system is memorialized in APD.SOP.1010, § 2.2 ("Mission Statement"), contained within the subsection entitled, "Policy," and which reads, "[t]he mission of [APD] is to reduce crime and promote the quality of life, in partnership with our community."

179.

APD SOP 1010 constitutes an official policy, practice and custom of the City and APD. Under § 1, the "Purpose" of this directive is to establish "the vision, mission, values, and organization of the Atlanta Police Department."

[11] http://www.atlantaga.gov/index.aspx?page=192 (last accessed on March 5, 2012)

180.

Each APD officer's job performance is evaluated, in part, based on his or her compliance with APD SOP 1010, which is reflected in APD's "Critical Job Element #1". APD's "Department Strategy" for this employment performance evaluator mirrors the APD mission contained in APD SOP 1010, § 2.2.

181.

Critical Job Element #1, entitled, "Appropriate Enforcement Action", measures the performance of an APD officer based on the officer's "enforcement activities", which are calculated by adding the number of arrests the officer makes, the number of citations the officer writes, and the number of calls for service. The enforcement activities are expressed as a "Daily Point Average." There are five categories used to evaluate an officer's compliance with this policy: "Unacceptable"; "Needs Improvement"; "Effective"; "Highly Effective"; and "Outstanding".

182.

Increased officer pay and promotion is dependent upon, among other things, meeting the City's law enforcement quotas.

183.

On July 1, 2011, just weeks before Plaintiff's arrest, Defendant Codrington was evaluated and received a "Needs Improvement" rating for Critical Job Element #1, meaning he was not meeting expectations with regard to the City's and APD's established law enforcement quota.

184.

Upon information and belief, Codrington arrested Plaintiff without probable cause or arguable probable cause in order to increase his arrest totals and in order to comply with the City's and APD's law enforcement quota policy.

185.

The City's law enforcement quota policy, as implemented and enforced through APD, was a moving force in the violation of Plaintiff's constitutional rights and in her false arrest, malicious prosecution and false imprisonment.

186.

At the time of Plaintiff's arrest, the City also promulgated, encouraged, enforced and maintained a policy of effecting searches and arrests of individuals without a valid search or arrest warrant.

187.

The policy of encouraging warrantless searches and arrests of individuals removes from the pre-search and pre-arrest procedures a probable cause determination by a judge.

188.

The policy of encouraging warrantless searches and arrests of individuals increases the likelihood that APD would search and arrest individuals without probable cause.

186.

The City, in conjunction with the County, encouraged and relied upon the Fulton County District Attorney "Complaint Room", instead of a judge, to establish probable cause of effecting the search and arrests of individuals and to charge alleged suspects. In Plaintiff's ease, Putnam

was directly involved as a factual investigator, along with APD, prior to deciding whether to prosecute Plaintiff.

189.

Reliance on this process instead a proper probable cause determination by judge, was a moving force in Plaintiff's false and unlawful search, arrest and prosecution without probable cause.

### APD STANDARD OPERATING PROCEDURES

190.

APD employs a chain of command whereby supervisory personnel are accountable for the performance of employees under their immediate supervision and uses a written directive system to provide employees with a clear understanding of the constraints and expectations relating to the performance of their duties. APD.SOP.1030, § 2.

191.

Turner, as the Chief of Police, is responsible for APD's SOP's and written directive system. His responsibilities include issuing, modifying, and approving APD's SOP's and manuals. APD.SOP.1030, § 3.1. Bureau, division and section commanders are responsible for implementing applicable directives within their respective commands. APD.SOP.1030, § 3.2.

192.

Supervisors are required to ensure that their subordinates receive, read, understand, and adhere to applicable directives. APD.SOP.1030, § 3.5.

193.

Employees are responsible for adhering to the written directives. APD.SOP.1030, § 3.6.

- 47 -

194.

APD has specific policies and procedures that govern arrest procedures. APD.SOP.3030.

195.

It is the responsibility of all supervisors to ensure that sworn employees within their command comply with the requirements of APD.SOP.3030 and will provide assistance as necessary. APD.SOP.3030, § 3.1. All sworn employees "will follow the requirements" of APD.SOP.3030. APD.SOP.3030, § 3.2. The Training Unit "will provide training necessary for compliance" with APD.SOP.3030. APD.SOP.3030, § 3.3.

196.

All persons "will be treated courteously, humanely, and with regard for their legal rights." APD.SOP.3030, § 4.1.6.

197.

The arresting officer is "responsible for submitting complete and accurate documents for the preservation of evidence," and for the proper presentation in court of all cases made by the officer. APD.SOP.3030, § 4.4.2.

198.

Felony charges must have "Complaint Room" written in the upper right hand corner of the arrest citation. The incident report and all supporting documents must be faxed to the Complaint Room, using the Complaint room cover sheet, at 404.224.3260. After faxing, the arresting officer will contact the Assistant District Attorney (ADA) at 404.224.3230 to discuss the case. The arresting officer will work with the ADA and provide additional information or documentation as needed or requested. APD.SOP.3030, § 4.4.3

- 48 -

199.

The arresting officer must attend court as scheduled or subpoenaed. APD.SOP.3030, § 4.4.4.

200.

Any APD employee transporting a prisoner "will ensure that that prisoner is the same person identified in the accompanying paperwork." APD.SOP.3030, § 4.15.1.

201.

APD sets policies for reports and report writing. APD.SOP.3060.

202.

Watch commanders, "will ensure that complete and accurate reports are turned in on a timely basis." APD.SOP.3060, § 3.3.

203.

The patrol officer is required to conduct a preliminary investigation, which includes "interviews with the complainant and other witnesses, to obtain the who, what, why, where, when, and how of the incident." The results of the investigation and officer's actions are described in an incident report; this report is the basis of APD's official knowledge of the incident and any subsequent action. APD.SOP.3060, § 4.1.1.

204.

The officer is required to use the incident report as an aid to the preliminary investigation of a crime. The officer is to ask questions in the order in which items appear on the form, generally from left to right and from top to bottom. Except where circumstances clearly indicate otherwise, all blocks and spaces on the form should be completed with the required information. If a block or space is not applicable, the officer must draw a line through it. "This

procedure simplifies the writing task and reduces the chance that important information will be omitted." APD.SOP.3060, §, 4.1.

205.

Each report submitted by an officer or investigator must be reviewed and approved by the officer's supervisor. This procedure is intended to ensure that reports are complete and legible when submitted to Central Records and to provide another opportunity for the supervisor to review the daily activities of the officer or investigator. APD.SOP.3060, § 4.1.5.

206.

The incident report, although primarily used to record information, can be used as an investigative tool by the police officer. The report is formatted to serve as a guide or an outline to follow when conducting an initial investigation. The report can help the officer develop those facts he or she knows to be important. APD.SOP.3060, § 4.1.5.

207.

APD sets forth required procedures for the officer's completion of the incident report. APD.SOP.3060, § 4.2.8.

208.

The back of the incident report has space to report on two individuals who may be arrestees, suspects, or missing persons. APD.SOP.3060, § 4.2.8.

209.

According to APD policy, "[i]t is important to have accurate and thorough descriptions of suspects and missing persons, so that they may be found." APD.SOP.3060, § 4.2.8.

210.

"In the case of the arrested person, the description may help in the investigation, in court

- 50 -

testimony, and in linking other cases." APD.SOP.3060, § 4.2.8.

211.

APD provides instructions for completion of the incident. APD.SOP.3060, § 4.2.

212.

According to APD, the narrative portion of the incident report "is the most important part of the incident report." APD.SOP.3060, § 4.2. "The information contained in a narrative will have a direct influence on the scope and quality of a follow-up investigation. If an arrest is made, the information contained in a narrative will have a direct bearing on the final judicial outcome of the case." APD.SOP.3060, § 4.2.

213.

In writing the narrative, the officer is required to, "obtain answers to the six basic questions: who, what, when, where, why and how." APD.SOP.3060, § 4.2.

214.

APD officers are required to proofread the report from beginning to end, and correct the omission of any critical fact. APD.SOP.3060, § 4.2.

215.

APD provides "Investigative Checklists" that contain specific questions the officer is required to ask as part of his or her investigation. APD.SOP.3060, § 4.4.

216.

APD promulgates certain "General Procedures" relating to the preliminary investigation of a crime. APD.SOP.3080. Each division, section and unit commander "shall ensure that all employees under their command are familiar with this procedure." APD.SOP.3080, § 3.1.

"Supervisors shall monitor this process and ensure that this procedure is followed." APD.SOP.3080, § 3.2.

217.

Activities during the preliminary investigation "shall center on the protection of persons, collection of evidence, apprehension of criminals at or near the crime scene and solving the reported crime." APD.SOP.3080, § 4.3.1.

218.

"Suspect identification procedures must be carefully arranged to avoid the danger or erroneous or suggestive identifications and to ensure the admission in court of accurate identification evidence." APD.SOP.3080, § 4.3.2.

219.

APD policy dictates that patrol officers "shall pursue preliminary investigations to the full extent of their available time and investigative training." APD.SOP.3080, § 4.3.7.

220.

It is the policy of the Atlanta Police Department to identify and apprehend offenders; recover property; gather, document, and evaluate facts regarding criminal activity; and assist in the prosecution of those charged with criminal offenses. APD.SOP.5010, § 2.1.

221.

The Criminal Investigations Division (CID) of APD "will perform the investigative tasks which go beyond the level performed by officers in the Field Operations Division." Cases assigned to CID will be properly monitored and managed by supervisors to ensure that the Division's resources are used effectively. APD.SOP.5010, § 2.2.

222.

The Criminal Investigations Division commander "is responsible for the overall operation of the Division. He or she will ensure that Division personnel comply with established policies, procedures, and rules of the Division and Department." APD.SOP.5010, § 3.2.1

223.

The Division Commander will be responsible for reporting monthly to the Chief of Police on the activities of the Division during the previous month, to include the type and number of arrests, seizures, major case status and fiscal accounting of Departmental funds within the Division. APD.SOP.5010, § 3.2.1.

224.

The section commanders will plan, organize, direct, and monitor the operations of their sections APD.SOP.5010, § 3.2.2. They will establish goals and provide appropriate policy and guidelines for operations. APD.SOP.5010, § 3.2.2.

225.

Unit commanders are responsible for the efficient and effective operation of their respective units. Unit commanders will direct the watch supervisors in their responsibilities. Unit commanders will ensure that vital information is communicated between watches and units by maintaining close liaison with other divisions and CID units. APD.SOP.5010, § 3.2.3.

226.

Unit supervisors will direct and instruct subordinates in their duties, provide and recommend training for investigators. ensure required court appearances by subordinates, and visit courts to observe subordinate conduct and performance. APD.SOP.5010, § 3.2.4. Unit supervisors personally respond to and assist with investigations of serious or complex crimes and

will closely monitor those investigations to ensure that appropriate resources are available and proper investigative action is taken. APD.SOP.5010, § 3.2.4.

227.

Investigators are responsible for properly conducting and completing investigations assigned to them. Investigators will plan, conduct, report on investigations, appear and testify in all required court hearings, and assist prosecutors in prosecuting cases assigned to them. APD.SOP.5010, § 3.2.5.

228.

The development of pertinent case information begins when a call is received and continues until the case is cleared or designated inactive. Obtaining and recording even minor information is often crucial to the successful conclusion of a case. APD.SOP.5010, § 4.3.1.

229.

Pursuant to APD policy, if the investigator assumes responsibility for handling the preliminary investigation, the investigator "will" immediately broadcast detailed and complete suspect lookouts, establish safeguards to preserve the crime scene, determine investigative steps already taken, and direct the search for and collect evidence at the crime scene and, if appropriate, arrange for photographs to be taken. Evidence should be collected whenever possible. APD.SOP.5010, § 4.6.5.

230.

After completion of the preliminary investigation, the investigator "will be responsible for conducting a thorough follow-up investigation." APD.SOP.5010, § 4.6.5.

231.

It will be the "responsibility of the investigator assigned to the case to attempt to contact

- 54 -

each victim, complainant, and witnesses within three working days of the case assignment."
APD.SOP.5010, § 4.11.1.

232.

The investigator will inform the victim, complainant, and witness of the investigator's
name, office phone number, times when the investigator can be contacted, the complaint number
of the case, and status of the case. During this initial contact, the investigator will inquire as to
further information regarding the case, clarify information initially reported, and document any
additional information. APD.SOP.5010, § 4.11.2.

233.

The victim, complainant, and witnesses will be contacted a second time within a 72 hour
period, when practical to update them on the case's progress. This policy will enhance the
relationship between the Criminal Investigation Division and victims, complainants, and
witnesses and instill public confidence that everything is being done to bring their case to a
successful close. APD.SOP.5010, § 4.11.4.

234.

Investigators will explain case prosecution procedures to the victim/witness giving them
information concerning how the case will be handled; the various procedures involved in the
prosecution of their case; and the role of victims/witnesses in those procedures, to include: their
participation in certain investigative functions like line-ups and the possibility that they may be
needed to provide testimony in court. APD.SOP.5010, § 4.11.5.

235.

Investigators will ensure that victims/witnesses are aware of and afforded access to a
Victim Witness Assistance Program (VWAP) advocate during the follow-up investigation.

APD.SOP.5010, § 4.11.6.

## FULTON COUNTY AND DISTRICT ATTORNEY POLICIES AND PROCEDURES

236.

The District Attorney prosecutes crimes in and on behalf of Fulton County, Georgia.

237.

The District Attorney, pursuant to the official and established policy and/or custom of Fulton County, requires that all felony criminal cases in Fulton County be investigated and reviewed in the District Attorney's Complaint Room as part of the criminal intake process. As part of this process, the assistant district attorney in the Complaint Room receives information about an alleged suspect from APD and initially participates in the factual investigation of the crime and the alleged suspect. This investigation is performed prior to any decision by the assistant district attorney to institute legal proceedings against any alleged suspect. In this process, the assistant district attorney essentially serves as an arm of APD and performs police-related, non-attorney investigatory tasks.

238.

Fulton County's use of the Complaint Room to screen criminal cases encourages, promotes and rewards expedited, but inaccurate and factually unsupported prosecutions, including Plaintiff's prosecution. Fulton County's use of the Complaint Room to screen cases removes the judge from the process of establishing that probable cause for a search or arrest of an individual exists and, therefore, leads to the search, arrest and prosecution of individuals when no probable cause exists. Fulton County's use of the Complaint Room, its justice plan and other official policies, practices and customs were a moving force in the constitutional and statutory violations set forth herein.

239.

The District Attorney, pursuant to the official and established policy and/or custom of Fulton County, does not require that charges initially included in a defendant's arrest citation, but which are not formally charged through indictment by the District Attorney, are dismissed at the time of indictment or at the time of dismissal or nolle prosequi of the indicted charges. As a consequence of this Fulton County policy and/or custom, defendants against who indicted charges are ultimately dropped or not pursued, are routinely held in the Fulton County Jail by the Fulton County Sheriff because the Sheriff holds inmates based on the initial arrest citations, not the list of indicted charges. Thus, when, as in Plaintiff's case, unindicted charges contained in the arrest citation are not dismissed by the District Attorney, the Sheriff holds the inmate until the appropriate dismissal of the unindicted charge is received.

240.

According to the District Attorney's "Trial Division Practices and Procedures Manual" ("Training Manual"), the Trial Division's "mission . . . is to dispose of cases in a competent, efficient and expeditious manner with due regard for the rights and feelings of [its] victims."

241.

The Training Manual provides further that,

> Early and honest preparation is the key to achieving this objective [and] [t]he process should begin with a thorough review of the case file, including the indictment or accusation, and the defendant's criminal history (GCIC). . . . early preparation . . . allows [the District Attorney] to catch errors in the charging document while there is sufficient time to re-indict or re-accuse the case.

- 57 -

242.

The Training Manual also states that. "[a]fter interviewing witnesses attorneys should again review the charging document to make sure that it matches up with the facts known at that time. . . . ."

243.

The District Attorney's Training Manual and policies require assistant district attorneys to speak with the victim and witnesses before settling on a course of action.  Again. this investigation mirrors the investigation that typically would be performed by the police.  The assistant district attorney essentially acts as a fact gatherer during this investigation.  The Training Manual also provides that it is "mandatory that attorneys make notes inside of the file with respect to each [] event or occurrence" in a case.  The Training Manual notes further that. "[i]t is essential that [the district attorney] maintain an accurate history of everything that happens with cases . . . ."

244.

The District Attorney's Employee Manual ("Employee Manual") section entitled. "Introduction. The District Attorney's Message". is authored by Howard and notes that the Employee Manual "sets forth certain policies and procedures applicable to all employees in the District Attorneys Office . . . ."

245.

The Employee Manual provides that. "[i]t is the responsibility of all such Employees . . . to comply with the contents of this manual."

246.

The Employee Manual provides that the "policies and procedures may be changed or variances granted in individual cases solely at the discretion of the District Attorney."

247.

The Employee Manual provides further that, "Assistant District Attorneys as well as other employees must do more than simply comply with the letter of what is written here. They must also use their common sense and good judgment to ensure that the professionalism, integrity, and independence of this Office is never compromised."

248.

The Employee Manual also reiterates mandatory compliance with Georgia's ethical rules for prosecutors, including that, "[a] public prosecutor . . . shall not institute or cause to be instituted criminal charges when he knows or it is obvious that the charges are not supported by probable cause. The District Attorney's rules also provide that a prosecutor's duty is not to convict, but to seek justice, and that "in our system of criminal justice the accused is to be given the benefit of all reasonable doubts."

249.

Fulton County's and the District Attorney's policy and/or custom of using the Complaint Room to investigate and charge crimes is purposely designed to remove the trial judge from process of making a probable cause determination.

250.

Use of the Complaint Room by Fulton County and the District Attorney eliminates the need to prepare probable cause affidavits from officers and eliminates the need for the officer to

otherwise testify to the facts needed to establish probable cause for a search or arrest of an

individual.

251.

Use of the Complaint Room by Fulton County and the District Attorney is an attempt to

shorten the time from arrest to indictment by the District Attorney.

252.

Use of the Complaint Room by the Fulton County and the District Attorney leads directly

to the search, arrest and prosecution of individuals, such as Plaintiff, without probable cause.

## COUNT I
### UNCONSTITUTIONAL SEARCH, SEIZURE AND FALSE ARREST IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BROUGHT PURSUANT TO 42 U.S.C. § 1983

### (*Against City of Atlanta and APD Defendants*)

253.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation

contained in the foregoing paragraphs of this First Amended Complaint.

### UNREASONABLE SEARCH OF PLAINTIFF

254.

On August 21, 2011, Codrington searched Plaintiff's person and/or at his express

instruction and order, caused Plaintiff's person to be searched.

255.

Codrington exercised his authority as a police officer to effect a search of Plaintiff's

person and clothing at the time of her arrest.

256.

Codrington searched and/or caused Plaintiff to searched without a search warrant and without probable cause and exigent circumstances to authorize a search of Plaintiff. Defendants Aguinaga and Strom, contributed to the search of Plaintiff by participating in the events and investigation leading up to the search, by encouraging the search of Plaintiff, and by failing to intervene to prevent the search of Plaintiff.

257.

Defendants had no reasonable belief that Plaintiff was armed and dangerous.

258.

The search of Plaintiff, including the forcible and unconsented searching of the contents of her pockets at her home, was unreasonable.

259.

Defendants' arrest of Plaintiff was not lawful.

260.

At the time of her search, seizure and arrest, Defendants had no objective and reasonable basis to suspect that Plaintiff had committed, was committing, or was about to commit any criminal offense.

261.

Defendants acted with reckless, deliberate and callous indifference to the constitutionally protected rights of Plaintiff.

### UNREASONABLE SEIZURE AND FALSE ARREST OF PLAINTIFF

262.

Based on the information available to Defendants, Codrington's seizure and arrest of Plaintiff's person on August 21, 2011 constituted an unreasonable seizure and false arrest under the Fourth and Fourteenth Amendments to the United States Constitution.

263.

Based on all of the information available to Defendants, Defendants had no probable cause or arguable probable cause to believe that Plaintiff had committed, was committing, or was about to commit any criminal offense.

264.

Defendants exercised their authority as police officers to effect the seizure and false arrest of Plaintiff.

265.

The seizure and arrest of Plaintiff was excessive, unreasonable, and unlawful.

266.

The seizure and arrest of Plaintiff was unreasonable and unlawful because, among other things, Defendants had no arrest warrant, had not witnessed the alleged crime, and, based on the information available to them, had no probable cause or arguable probable cause to arrest Plaintiff.

267.

Defendants intended to arrest and confine Plaintiff and committed acts that resulted in her confinement and prosecution. Defendants Aguinaga and Strom contributed to Plaintiff's seizure, arrest, confinement and prosecution by participating in the events and investigation leading up to

her arrest, by encouraging her arrest and by failing to intervene to prevent her arrest and confinement.

268.

Plaintiff was aware of her confinement. Plaintiff was not free to leave, and Plaintiff reasonably did not believe that she was free to leave.

269.

Defendants had a duty to intervene when the violations of Plaintiff's constitutional rights took place in order to protect Plaintiff, but Defendants failed or refused to do so, and they, therefore, are directly and personally liable for their nonfeasance under 42 U.S.C. § 1983.

270.

Defendants acted with reckless, deliberate and callous indifference to the constitutionally protected rights of Plaintiff.

271.

It was clearly established on August 21, 2011 that searching, detaining, seizing and arresting Plaintiff without a warrant essentially because she was a black female named "Teresa" who had made a complaint to APD earlier in the day would violate Plaintiff's clearly-established constitutional rights. Defendants had fair warning that their conduct would violate the Constitution, and no reasonable officer could have believed that the search, seizure and arrest of Plaintiff was legal.

272.

Defendants' actions in searching, seizing and arresting Plaintiff were conducted pursuant to a City and APD policy, practice and/or custom with the force of law to arrest individuals without a warrant, without probable cause and without first properly confirming the identity of

- 63 -

the alleged suspect. Plaintiff was searched, seized and arrested by APD employees and later confined in the Fulton County Jail as a result of a City and APD policy, practice and/or custom of using the District Attorney's Complaint Room instead of a judge to make a probable cause determination. Plaintiff was searched, seized and arrested by APD employees as a result of a City and APD policy, practice and/or custom of using arrest quotas to measure and evaluate officer performance, which led Codrington and the other APD Defendants to prematurely and without justification, target Plaintiff, and which policy was a moving force in the unconstitutional search, seizure and arrest of Plaintiff.

273.

A real and actual controversy exists, necessitating declaratory and injunctive relief from this Court, in that the City and APD continue to maintain the legality of the aforementioned policies, practices and/or customs. Plaintiff continues to be specially subject to unlawful search, seizure and arrest without a warrant and without probable cause and subject to arrest pursuant to a policy, practice and custom of using arrest quotas.

274.

As a direct and proximate consequence and result of the acts of Defendants, Plaintiff suffered economic damages, was deprived of her liberty for a substantial period of time, suffered much anxiety and distress over the separation from her family and friends, and much discomfort and embarrassment, her reputation was impaired, and she lost much time from her home and the companionship and care of her family and friends.

275.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

- 64 -

## COUNT II
### FALSE AND MALICIOUS PROSECUTION AND FALSE IMPRISONMENT IN VIOLATION OF THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BROUGHT PURSUANT TO 42 U.S.C. § 1983

#### *(Against All Defendants)*

276.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation

contained in the foregoing paragraphs of this Complaint.

277.

Under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution,

Defendants were required to take appropriate and sufficient steps to eliminate doubts concerning

Plaintiff's identity before arresting, prosecuting and incarcerating her.

278.

At least the following information about Plaintiff's identity was available to Defendants

at or near the time of Plaintiff's arrest to suggest she was not the correct suspect:

- Plaintiff had her driver's license on her person at the time of her arrest, but no one at APD ever looked at it or collected it for evidence;

- The information on Plaintiff's driver's license differed significantly from the description Boyd had provided for Gilbert;

- Plaintiff's physical makeup did not match the physical description provided by Boyd;

- Plaintiff did not have a gold tooth, which Boyd described Gilbert having on the left side of her mouth;

- Plaintiff was not wearing a blue jean dress, which Boyd described Gilbert as wearing;

- Plaintiff's name did not match that of Gilbert;

- Plaintiff's social security number did not match that of Gilbert;

- Plaintiff's date of birth did not match that of Gilbert;

- 65 -

- Plaintiff's address did not match that of Gilbert or the location where Boyd claimed the crime occurred; and

- Plaintiff's telephone number did not match the number Boyd gave for Gilbert.

279.

Defendants intentionally disregarded or dismissed vital information and facts that would have eliminated Plaintiff as a suspect.

280.

Defendants intentionally and without justification dismissed Plaintiff's version of events without any investigation.

## APD DEFENDANTS

281.

APD Defendants intentionally and without justification dismissed statements by alibi witnesses at Plaintiff's residence indicating that Plaintiff had not left the residence all day.

282.

APD Defendants failed to visit the crime scene, even though Boyd indicated Gilbert would still be there, the crime scene was more than a mile from Plaintiff's house, and Boyd had told Aguinaga that Gilbert did not live on Hawkins Street.

283.

APD Defendants failed to have Boyd identify Plaintiff in any manner.

284.

APD Defendants' failures to take any steps to properly identify Plaintiff before labeling her as the sole suspect reflected a deliberate indifference to her constitutional rights.

285.

At the time of her arrest, Plaintiff had a clearly established right against false arrest and false imprisonment without due process.

286.

A reasonable officer in the position of the APD Defendants would have known that his or her conduct could violate Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution not to be falsely arrested or falsely imprisoned.

287.

A reasonably well-trained officer would have at least attempted to obtain information to confirm the suspect's true identity before arresting Plaintiff.

288.

A reasonable officer would have been sufficiently concerned by the discrepancies in the information to make further investigation as to whether Plaintiff was, in fact, Gilbert and that Plaintiff had committed the alleged crime.

289.

A reasonable officer would not rely on Codrington's unsupported and unjustified identification of Plaintiff as the sole suspect based entirely on the fact that she was a black female, her first name was "Teresa" and she had contacted police earlier in the day.

290.

A reasonable officer in the position of the APD Defendants would be unlikely, in the face of Plaintiff's assertions of mistaken identity and innocence, to arrest and book Plaintiff into jail on the basis that she committed the crime without first taking steps to verify she had, in fact, done so.

291.

Based on the information readily available, no reasonable officer in the position of the APD Defendants could have believed probable cause or arguable probable cause existed to arrest Plaintiff.

292.

Defendants' actions in falsely arresting, prosecuting and imprisoning Plaintiff were conducted pursuant to a City and APD policy, practice and/or custom with the force of law to arrest individuals without a warrant, without probable cause and without first properly confirming the identity of the alleged suspect. The APD Defendants' violations of Plaintiff's constitutional right to be free from false arrest, prosecution and imprisonment were the result of a City and APD policy, custom, or practice of using arrest quotas to measure officer performance, which led the APD Defendants to prematurely and without probable cause and without a valid search or arrest warrant, target Plaintiff for prosecution, and which was a moving force in the malicious prosecution and false imprisonment of Plaintiff. Plaintiff was searched, seized and arrested by APD employees and later confined in the Fulton County Jail as a result of a City and APD policy, practice and/or custom of using the District Attorney's Complaint Room instead of a judge to make a probable cause determination.

293.

A real and actual controversy exists, necessitating declaratory and injunctive relief from this Court, in that the City and APD continue to maintain the legality of the aforementioned policies, practices and/or customs. Plaintiff continues to be specially subject to false and malicious prosecution and false imprisonment pursuant to the foregoing policies, practices and customs

- 68 -

## DISTRICT ATTORNEY DEFENDANTS

294.

On August 21, 2011, during his investigation into the facts and circumstances of the alleged crime against Boyd, but before Defendant Putnam charged Plaintiff, Putnam was carrying out solely administrative and/or investigative functions akin to a police officer and was not performing as an advocate for the District Attorney.

295.

At the time Putnam was performing his investigation on August 21, 2011, APD had not completed its investigation into the facts surrounding Plaintiff's arrest or her involvement in any alleged incident involving Boyd and, thus, the factual investigation into the case was ongoing, and Putnam participated in the factual investigation along with APD.

296.

When Putnam and Aguinaga spoke by telephone on August 21, 2011, Putnam was merely investigating the factual basis for the arrest including how APD verified Plaintiff was the correct suspect. This is an investigative function that an APD supervisor would have and could have performed, and required no advocacy on the part of Putnam.

297.

By personally running a search of Plaintiff in the GCIC database, including the information concerning Plaintiff's alleged alias in the August 21, 2011 "Statement of Witness" and then knowingly having Aguinaga sign the "Statement of Witness" under oath, Putnam provided sworn testimony as to the truth of the information contained in the "Statement of Witness".

- 69 -

298.

Because Putnam knowingly had no factual basis to believe that Plaintiff had ever used the alias, "Teresa Gilbert" or that Boyd knew Plaintiff as "Teresa Gilbert". Putnam knowingly procured and provided false sworn testimony in the "Statement of Witness".

299.

In her testimony before the Grand Jury, Aguinaga testified to the same information contained in the "Statement of Witness". Aguinaga indicated in her sworn statement to APD's Office of Professional Standards that she "just presented the facts of the case and stated in my facts that I was given and that the arrested subject told Officer Codrington a different name than I was given at the hospital."

300.

Defendant Putnam's personal procurement of the sworn testimony contained in the "Statement of Witness", which formed the basis of Aguinaga's testimony before the Grand Jury, and for which Aguinaga had no personal knowledge, made Putnam a complaining witness against Plaintiff.

301.

Putnam knowingly directed and supervised Aguinaga to sign the "Statement of Witness", which was materially false.

302.

When Putnam told Aguinaga that he believed Plaintiff was using an alias, and after learning that Plaintiff had already been taken to the Fulton County Jail, then stated that he would handle it on "his" end, Putnam was giving Aguinaga, a police officer, advice on a proposed course of action.

303.

On August 21, 2011, Defendant Keel supervised and monitored each and every employee of the Fulton County Complaint Room, including Putnam, on the date and time at issue and prior to any formal charges be filed against Plaintiff.

304.

Upon information and belief. Keel assisted and advised Putnam, provided facts and information to Putnam, and/or was knowingly compliant with Putnam's pre-indictment investigation and decision-making surrounding Plaintiff's arrest.

305.

In her role as a trainer and supervisor in the Complaint Room prior to Plaintiff's indictment, Keel was acting and functioning solely as an administrator and/or factual investigator.

306.

Upon information and belief, Defendant Davis, and a yet unknown "line supervisor" in the Complaint Room reviewed the facts surrounding Plaintiff's arrest and authorized the investigation into, and case against, Plaintiff to continue.

307.

Upon information and belief, Defendant Settles questioned Aguinaga at the Grand Jury Proceedings and elicited false testimony from her concerning Plaintiff's alleged alias.

308.

Defendants Wilson. Vann and Deas acted as factual investigators, not legal advocates, and had direct contact with Boyd, who told Defendants that the District Attorney's prosecution of Plaintiff was wrong and false and that he had seen the true suspect.

- 71 -

309.

Defendants Wilson, Vann and Deas knowingly failed to take any action based on the information provided by Boyd to obtain Plaintiff's release from the Sheriff's custody.

310.

Upon information and belief, Putnam and/or Davis in connection with Plaintiff's bond hearing, presented to the Court the false testimony contained in the "Statement of Witness" completed by Putnam and signed by Aguinaga.

311.

When Boyd told the District Attorney's Office that Plaintiff was not the correct suspect and that the correct suspect was still walking the streets, the District Attorney's role as an advocate for Boyd and other citizens of Fulton County (in connection with Plaintiff's arrest) ended.

312.

On October 6, 2012, when Boyd exonerated Plaintiff, Plaintiff's charges were dropped and the District Attorney agreed not to pursue a criminal case against Ms. Culpepper, the District Attorney's role as an advocate had already ended. Defendant Walton should have dismissed the unindicted misdemeanor battery charge, but failed to do so.

313.

The actions and conduct of the District Attorney Defendants were not undertaken in good faith, violated Plaintiff's clearly established rights not to be falsely and maliciously prosecuted and imprisoned, and violated clearly established constitutional law under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

- 72 -

314.

A reasonable person in the position of the District Attorney Defendants would have

known, among other things, that:

- Putnam had falsely and without any evidence determined on August 21, 2011 that Plaintiff was using an alias;

- Based on the information provided by Boyd to 911 and Aguinaga concerning Gilbert's identity, Putnam knew or should have known that his conclusion that Plaintiff had used the alias, "Gilbert", was false;

- Based on the information provided by Boyd to 911 and Aguinaga that he had known the suspect as Gilbert, not Culpepper, for years, Putnam knew or should have known that Aguinaga's August 21, 2011 witness statement that Boyd knew Plaintiff as Teresa Gilbert, was false;

- Based on the information provided in the arrest citation and the incident report, Putnam knew or should have known that Plaintiff had not used the alias, "Gilbert";

- Based on the information contained in the criminal background check run on Plaintiff, Putnam knew or should have known that Plaintiff had never used the alias, "Gilbert", and that his conclusion that she had used an alias was false;

- Based on the information available to the District Attorney Defendants, including the 911 calls from Boyd and Plaintiff on August 21, 2011, Aguinaga's testimony in her August 21, 2011 sworn witness statement was false;

- Based on the information available to the District Attorney Defendants, including the 911 calls from Boyd and Plaintiff on August 21, 2011, Aguinaga's testimony before the grand jury on September 2, 2011 was false;

- An indictment of Plaintiff based on false information provided by Aguinaga would violate Plaintiff's clearly established right not to be maliciously prosecuted and to not be falsely and wrongful imprisoned;

- Had Boyd been interviewed by the District Attorney Defendants prior to September 2, 2011, Boyd would have exonerated Plaintiff, and she would not have been further prosecuted or imprisoned;

- After Boyd spoke with Vann and told Vann that the wrong person had been arrested, Plaintiff was actually innocent;

- There was no probable cause or justification for prosecuting Plaintiff;

- Prosecution of Plaintiff, an innocent person, was wrong and malicious;

- Failure to properly communicate and/or investigate Boyd's statements to Vann, particularly in light of the significant contradictory evidence surrounding the initial identification and arrest, would violate Plaintiff's clearly established right to be free from unlawful imprisonment and prosecution.

- No probable cause existed for Plaintiff's arrest;

- Plaintiff was not Gilbert;

- Plaintiff was innocent;

- APD had arrested the wrong person; and

- Plaintiff should never have been prosecuted and imprisoned and, instead, should have been released from custody as soon as the District Attorney's office received the arrest documents from APD.

315.

The District Attorney Defendants' violations of Plaintiff's established rights caused her

to be unlawfully and maliciously prosecuted and falsely incarcerated for nearly two months.

316.

Had the District Attorney Defendants acted reasonably with the information available to

them, Plaintiff's prosecution and wrongful imprisonment would have been avoided.

317.

Defendant Howard personally participated in Plaintiff's prosecution by signing the

indictment and serving discovery on August 21, 2011.

318.

The District Attorney Defendants' violations of Plaintiff's constitutional right to be free

from malicious or unlawful prosecution and imprisonment were the result of a Fulton County

and District Attorney policy, custom, or practice of using the Complaint Room to initially

investigate and charge felony criminal cases in Fulton County. The primary goal of the Complaint Room is to expedite the time to conviction, not to properly investigate and charge felony criminal cases. Fulton County's policy of using the Complaint Room led directly to Plaintiff being wrongfully targeted by the District Attorney for prosecution, and encouraged and caused Putnam to falsely determine that Plaintiff had used an alias, thereby ensuring that Plaintiff would be falsely and maliciously incarcerated and prosecuted. Use of the Complaint Room by Fulton County and the District Attorney is designed to remove the trial judge from process of determining probable cause for a search or arrest of an individual. Use of the Complaint Room by Fulton County and the District Attorney eliminates the need to prepare probable cause affidavits from officers and eliminates the need for the officer to otherwise testify to the facts needed to establish probable cause for a search or arrest of an individual. Use of the Complaint Room by Fulton County and the District Attorney is an attempt to shorten the time from arrest to indictment by the District Attorney. Use of the Complaint Room by the Fulton County and the District Attorney leads directly to the search, arrest and prosecution of individuals, such as Plaintiff, without probable cause.

319.

The District Attorney, pursuant to the official and established policy and/or custom of Fulton County, does not require that charges initially included in a defendant's arrest citation, but which are not formally charged through indictment by the District Attorney, are dismissed at the time of indictment or at the time of dismissal or nolle prosequi of the indicted charges. As a consequence of this Fulton County policy and/or custom, defendants against who indicted charges are ultimately dropped or not pursued, Plaintiff was held for nearly another week in jail even though the District Attorney had agreed she was innocent.

320.

Fulton County's policies, customs and practices give rise to the liability of the District Attorney Defendants and Fulton County.

321.

A real and actual controversy exists, necessitating declaratory and injunctive relief from this Court, in that Fulton County and the District Attorney continue to maintain the legality of the aforementioned policies, practices and/or customs. Plaintiff continues to be specially subject to unlawful malicious prosecution and false imprisonment pursuant to a policy, practice and custom of using arrest quotas.

**SHERIFF DEFENDANTS**

322.

Under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, the Sheriff Defendants were required to properly investigate Plaintiff's claims of innocence.

323.

After being falsely arrested and booked into the Fulton County Jail, Plaintiff told the Sheriff Defendants several times that she was innocent of the charges and asked them to investigate why she was being held.

324.

The Sheriff Defendants failed to inquire into Ms. Culpepper's claims of innocence.

325.

Instead of investigating Plaintiff's claims of innocence, Defendant Jackson threatened to charge Plaintiff with further criminal prosecution if she continued to plead her innocence.

326.

The Sheriff's detention of Plaintiff after her false arrest constituted a violation of her constitutional right to be free from unlawful and false imprisonment.   Plaintiff had a constitutional right to be free from imprisonment where the circumstances and facts under Defendants' consideration demonstrated that the APD Defendants clearly lacked probable cause to make an arrest.

327.

Plaintiff continued to protest her detention on the basis that she was not the one who had committed the crime, but until October 6, 2011, no line-up, show-up or other form of identification was performed, requested or offered, and the Sheriff Defendants never afforded Plaintiff an opportunity to prove her innocence.

## THE CITY AND FULTON COUNTY

328.

The APD Defendants' actions in causing Plaintiff to be falsely arrested and then maliciously prosecuted and falsely imprisoned for nearly two months resulted from a City policy, practice and/or custom with the force of law to arrest individuals without a warrant, without probable cause and without first properly confirming the identity of the alleged suspect. Plaintiff was searched, seized and arrested by APD employees as a result of a City and APD policy, practice and/or custom of using arrest quotas to measure and evaluate officer performance, which led APD to prematurely and without probable cause target Plaintiff, and which was a moving force in Plaintiff's malicious prosecution and false imprisonment in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

- 77 -

329.

The District Attorney Defendants' violations of Plaintiff's constitutional right to be free from malicious or unlawful prosecution and imprisonment were the result of a Fulton County policy, custom, or practice of using the Complaint Room to initially investigate and charge felony criminal cases in Fulton County. Fulton County's policy of using the Complaint Room led directly to Plaintiff being wrongfully targeted by the District Attorney for prosecution, and encouraged and caused Putnam to falsely determine that Plaintiff had used an alias, thereby ensuring that Plaintiff would be falsely and maliciously incarcerated and prosecuted. Use of the Complaint Room by Fulton County and the District Attorney is designed to remove the trial judge from process of determining probable cause for a search or arrest of an individual. Use of the Complaint Room by Fulton County and the District Attorney eliminates the need to prepare probable cause affidavits from officers and eliminates the need for the officer to otherwise testify to the facts needed to establish probable cause for a search or arrest of an individual. Use of the Complaint Room by Fulton County and the District Attorney is an attempt to shorten the time from arrest to indictment by the District Attorney. Use of the Complaint Room by the Fulton County and the District Attorney leads directly to the search, arrest and prosecution of individuals, such as Plaintiff, without probable cause. Fulton County does not require that charges initially included in a defendant's arrest citation, but which are not formally charged through indictment by the District Attorney, are dismissed at the time of indictment or at the time of dismissal or nolle prosequi of the indicted charges. As a consequence of this Fulton County policy and/or custom, defendants against who indicted charges are ultimately dropped or not pursued, Plaintiff was held for nearly another week in jail even though the District Attorney had

- 78 -

agreed she was innocent. Fulton County's policies, customs and practices give rise to the liability of Fulton County.

330.

Defendants' actions caused Plaintiff to be unlawfully arrested, incarcerated and prosecuted in violation of her rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Defendants knew or should have known that the imprisonment of Plaintiff may have constituted an unlawful imprisonment under § 1983 in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Defendants continued to unlawfully detain and confine Plaintiff when Defendants knew or should have known that Plaintiff had been wrongfully identified as the suspect, Plaintiff was innocent the crimes alleged, and Plaintiff was entitled to be released from custody.

331.

As a direct and proximate consequence and result of the acts of Defendants, Plaintiff suffered economic damages, was deprived of her liberty for a substantial period of time, suffered much anxiety and distress over the separation from her family and friends, and much discomfort and embarrassment, her reputation was impaired, and she lost much time from her home and the companionship and care of her family and friends.

332.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

## COUNT III
### DENIAL OF RIGHTS GUARANTEED UNDER THE GEORGIA
### CONSTITUTION, ART. I, SEC. 1, ¶¶ I, VII, XIII, AND XXVIII

#### (*Against all Defendants*)

333.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation contained in the foregoing paragraphs of this First Amended Complaint.

334.

The Georgia Constitution secures certain rights for Plaintiff, a citizen of the State of Georgia, including the right not to be deprived of her liberty or property except by due process of law, guaranteed by Article I, Section 1, Paragraph I, of said Constitution; the right to the impartial and complete equal protection of the law, guaranteed by; the right to the full enjoyment of the rights, privileges, and immunities due to her as a citizen of the United States and of the State of Georgia, as protected by Article I, Section I, Paragraph VII of said Constitution; the right to be secure in her person and affects against unreasonable and warrantless searches and seizures, except upon probable cause supported by oath or affirmation, as secured by Article I, Section I, Paragraph XIII of said Constitution; and her rights reserved or retained under Article I, Section 1, Paragraph XXVIII of said Constitution.

335.

Through their wrongful and malicious acts set forth above, all performed under color of law and pursuant to the customs and usages of the City, APD, the County, the District Attorney, and/or the Sheriff, Defendants deprived Plaintiff of her rights, privileges, and immunities secured to her by the Constitution and laws of the State of Georgia, and particularly her right not to be deprived of her liberty or property except by due process of law, guaranteed by Article I, Section

I, Paragraph I, of said Constitution; her right to the full enjoyment of the rights, privileges, and immunities due to her as a citizen of the United States and of the State of Georgia, as protected by Article I, Section I, Paragraph VII of said Constitution; his right to be secure in his person and affects against unreasonable and warrantless searches and seizures, except upon probable cause supported by oath or affirmation, as secured by Article I, Section I, Paragraph XIII of said Constitution; and her rights reserved or retained under Article I, Section I, Paragraph XXVIII of said Constitution.

336.

In doing the wrongful and malicious acts and things above complained of, the defendants were conspirators engaged in a scheme and conspiracy designed and intended to deny and deprive her of rights guaranteed to her under the Constitution of the State of Georgia, particularly those hereinabove enumerated.

337.

As a direct and proximate consequence and result of the acts of Defendants, Plaintiff suffered economic damages, was deprived of her liberty for a substantial period of time, suffered much anxiety and distress over the separation from her family and friends, and much discomfort and embarrassment, her reputation was impaired, and she lost much time from her home and the companionship and care of her family and friends.

338.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

## COUNT IV
### FALSE ARREST PURSUANT TO O.C.G.A. § 51-7-1, ET SEQ.

#### (Against Defendants City of Atlanta and APD Defendants)

339.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation contained in the foregoing paragraphs of this First Amended Complaint.

340.

Plaintiff's arrest was undertaken and performed without probable cause or arguable probable cause because the above acts of Defendants and circumstances are such as to satisfy a reasonable person that Defendants had no grounds for proceeding but their desire to injure Plaintiff.

341.

Based on the information available to Defendants at the time of Plaintiff's arrest, Plaintiff's arrest was made maliciously.

342.

Plaintiff's arrest constituted a wanton abuse of power under color of authority.

343.

False arrest is a tort for which an action will lie in damages under O.C.G.A. § 51-7-1.

344.

The APD Defendants' actions in causing Plaintiff to be falsely arrested and then maliciously prosecuted and falsely imprisoned for nearly two months resulted from a City policy, practice and/or custom with the force of law to arrest individuals without a warrant, without probable cause and without first properly confirming the identity of the alleged suspect. The APD Defendants' violations of Plaintiff's constitutional right to be free from false arrest,

- 82 -

prosecution and imprisonment were the result of a City and APD policy, custom, or practice of using arrest quotas to measure officer performance, which led the APD Defendants to prematurely and without probable cause and without a valid search or arrest warrant, target Plaintiff for prosecution, and which was a moving force in the malicious prosecution and false imprisonment of Plaintiff. Plaintiff was searched, seized and arrested by APD employees and later confined in the Fulton County Jail as a result of a City and APD policy, practice and/or custom of using the District Attorney's Complaint Room instead of a judge to make a probable cause determination. These policies, practices and customs of the City and APD were a moving force in Plaintiff's false arrest, malicious prosecution and false imprisonment and in violation of Plaintiff's rights.

345.

As a direct and proximate consequence and result of the acts of Defendants, Plaintiff suffered economic damages, was deprived of her liberty for a substantial period of time, suffered much anxiety and distress over the separation from her family and friends, and much discomfort and embarrassment, her reputation was impaired, and she lost much time from her home and the companionship and care of her family and friends.

346.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

**COUNT V**
**MALICIOUS PROSECUTION PURSUANT TO O.C.G.A. § 51-7-40, ET SEQ.**

*(Against Defendants City of Atlanta, APD*
*Defendants, Fulton County and District Attorney Defendants)*

347.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation

contained in the foregoing paragraphs of this First Amended Complaint.

348.

Defendants subjected Plaintiff, an innocent person, to search, seizure, arrest and criminal

prosecution for criminal offenses that she did not commit.

349.

Defendants formally accused her of committing criminal offenses that she did not

commit.

350.

Defendants' accusation and prosecution of Plaintiff was undertaken and performed under

the color of law and pursuant to the customs and usages of the City, APD, Fulton County and the

District Attorney.

351.

The criminal prosecution of Plaintiff terminated in favor of Plaintiff.

352.

Defendants unreasonably failed to properly and fully investigate before initiating the

prosecution of Plaintiff.

- 84 -

353.

Defendants maliciously instituted and maintained the criminal proceedings against Plaintiff knowing that she was innocent.

354.

Defendants' criminal prosecution of Plaintiff was undertaken with a total lack of probable cause for the proceedings and a total lack of good faith on the part of Defendants.

355.

Defendants continued with their criminal prosecution of Plaintiff even after learning from the victim directly that Plaintiff was innocent of the charged offenses.

356.

Defendants' actions in falsely prosecuting Plaintiff were conducted pursuant to a City and APD policy, practice and/or custom with the force of law to arrest individuals without a warrant, without probable cause and without first properly confirming the identity of the alleged suspect. The APD Defendants' violations of Plaintiff's constitutional right to be free from false arrest, prosecution and imprisonment were the result of a City and APD policy, custom, or practice of using arrest quotas to measure officer performance, which led the APD Defendants to prematurely and without probable cause and without a valid search or arrest warrant, target Plaintiff for prosecution, and which was a moving force in the malicious prosecution and false imprisonment of Plaintiff. Plaintiff was searched, seized and arrested by APD employees and later confined in the Fulton County Jail as a result of a City and APD policy, practice and/or custom of using the District Attorney's Complaint Room instead of a judge to make a probable cause determination. These policies, practices and customs of the City and APD were a moving

force in Plaintiff's false arrest, malicious prosecution and false imprisonment and in violation of
Plaintiff's rights.

357.

The District Attorney Defendants' violations of Plaintiff's constitutional right to be free
from malicious or unlawful prosecution and imprisonment were the result of a Fulton County
policy, custom, or practice of using the Complaint Room to initially investigate and charge
felony criminal cases in Fulton County. The primary goal of the Complaint Room is to expedite
the time to conviction, not to properly investigate and charge felony criminal cases. Fulton
County's policy of using the Complaint Room led directly to Plaintiff being wrongfully targeted
by the District Attorney for prosecution, and encouraged and caused Putnam to falsely determine
that Plaintiff had used an alias, thereby ensuring that Plaintiff would be falsely and maliciously
incarcerated and prosecuted. Use of the Complaint Room by Fulton County and the District
Attorney is designed to remove the trial judge from process of determining probable cause for a
search or arrest of an individual. Use of the Complaint Room by Fulton County and the District
Attorney eliminates the need to prepare probable cause affidavits from officers and eliminates
the need for the officer to otherwise testify to the facts needed to establish probable cause for a
search or arrest of an individual. Use of the Complaint Room by Fulton County and the District
Attorney is an attempt to shorten the time from arrest to indictment by the District Attorney. Use
of the Complaint Room by the Fulton County and the District Attorney leads directly to the
search, arrest and prosecution of individuals, such as Plaintiff, without probable cause. Fulton
County's policies, customs and practices give rise to the liability of Fulton County.

358.

As a direct and proximate consequence and result of the acts of Defendants, Plaintiff suffered economic damages, was deprived of her liberty for a substantial period of time, suffered much anxiety and distress over the separation from her family and friends, and much discomfort and embarrassment, her reputation was impaired, and she lost much time from her home and the companionship and care of her family and friends.

359.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

### COUNT VI
### FALSE IMPRISONMENT PURSUANT TO O.C.G.A. § 51-7-20, ET SEQ.

#### (Against All Defendants)

360.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation contained in the foregoing paragraphs of this Complaint.

361.

Defendants' actions caused Plaintiff to be arrested and unlawfully incarcerated in the Fulton County Jail for nearly two months when she was innocent of the crimes alleged against her.

362.

By unlawfully and falsely causing Plaintiff to be arrested and incarcerated for nearly two months, Defendants denied Plaintiff of her personal liberty, and are liable for false imprisonment, a tort for which an action for damages will lie under O.C.G.A. § 51-7-20.

363.

Defendants' actions in falsely prosecuting Plaintiff were conducted pursuant to a City and APD policy, practice and/or custom with the force of law to arrest individuals without a warrant, without probable cause and without first properly confirming the identity of the alleged suspect. The APD Defendants' violations of Plaintiff's constitutional right to be free from false arrest, prosecution and imprisonment were the result of a City and APD policy, custom, or practice of using arrest quotas to measure officer performance, which led the APD Defendants to prematurely and without probable cause and without a valid search or arrest warrant, target Plaintiff for prosecution, and which was a moving force in the malicious prosecution and false imprisonment of Plaintiff. Plaintiff was searched, seized and arrested by APD employees and later confined in the Fulton County Jail as a result of a City and APD policy, practice and/or custom of using the District Attorney's Complaint Room instead of a judge to make a probable cause determination. These policies, practices and customs of the City and APD were a moving force in Plaintiff's false arrest, malicious prosecution and false imprisonment and in violation of Plaintiff's rights.

364.

The District Attorney Defendants' violations of Plaintiff's constitutional right to be free from malicious or unlawful prosecution and imprisonment were the result of a Fulton County policy, custom, or practice of using the Complaint Room to initially investigate and charge felony criminal cases in Fulton County. The primary goal of the Complaint Room is to expedite the time to conviction, not to properly investigate and charge felony criminal cases. Fulton County's policy of using the Complaint Room led directly to Plaintiff being wrongfully targeted by the District Attorney for prosecution, and encouraged and caused Putnam to falsely determine

- 88 -

that Plaintiff had used an alias, thereby ensuring that Plaintiff would be falsely and maliciously incarcerated and prosecuted. Use of the Complaint Room by Fulton County and the District Attorney is designed to remove the trial judge from process of determining probable cause for a search or arrest of an individual. Use of the Complaint Room by Fulton County and the District Attorney eliminates the need to prepare probable cause affidavits from officers and eliminates the need for the officer to otherwise testify to the facts needed to establish probable cause for a search or arrest of an individual. Use of the Complaint Room by Fulton County and the District Attorney is an attempt to shorten the time from arrest to indictment by the District Attorney. Use of the Complaint Room by the Fulton County and the District Attorney leads directly to the search, arrest and prosecution of individuals, such as Plaintiff, without probable cause. The District Attorney, pursuant to the official and established policy and/or custom of Fulton County, does not require that charges initially included in a defendant's arrest citation, but which are not formally charged through indictment by the District Attorney, are dismissed at the time of indictment or at the time of dismissal or nolle prosequi of the indicted charges. As a consequence of this Fulton County policy and/or custom, defendants against who indicted charges are ultimately dropped or not pursued, Plaintiff was held for nearly another week in jail even though the District Attorney had agreed she was innocent. Fulton County's policies, customs and practices give rise to the liability of Fulton County.

365.

As a direct and proximate consequence and result of the acts of Defendants, Plaintiff suffered economic damages, was deprived of her liberty for a substantial period of time, suffered much anxiety and distress over the separation from her family and friends, and much discomfort

and embarrassment, her reputation was impaired, and she lost much time from her home and the companionship and care of her family and friends.

366.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

## COUNT VII
### NEGLIGENCE IN THE PERFORMANCE OF MINISTERIAL DUTIES

#### (Against APD Defendants, District Attorney Defendants and Sheriff Defendants)

367.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation contained in the foregoing paragraphs of this Complaint.

368.

Defendants Turner, Moss, Finley, Shields, Quiller and Glazier negligently breached their ministerial duties by failing to properly hire, train and supervise Codrington, Aguinaga and Strom on arrest procedures in violation of APD.SOP.3030, § 3.3.

369.

Defendants Turner, Moss, Finley, Shields, Quiller and Glazier negligently breached their ministerial duties by failing to ensure that Codrington, Aguinaga and Strom complied fully with mandatory APD written directives in violation of, among others, APD.SOP.3030, § 3.1, APD.SOP.3080, §§ 3.1 and 3.2, APD.SOP.5010, §§ 3.2.1, 3.2.2, 3.2.3, and 3.2.4.

370.

Defendants Codrington, Aguinaga and Strom negligently breached their duties by failing to adhere to APDs written directives in violation of APD.SOP.1030, § 3.6, APD.SOP.3030, § 3.2.

- 90 -

371.

Defendants Codrington. Aguinaga and Strom negligently breached their statutory duties by arresting Plaintiff or causing Plaintiff to be arrested without a warrant in violation of O.C.G.A. §17-4-20 and APD.SOP.3030. § 4.1.4.

372.

Defendants Codrington. Aguinaga and Strom negligently breached their ministerial duties by failing to treat Plaintiff courteously. humanely, and with regard for her legal rights in violation of APD.SOP.3030. § 4.1.6.

373.

Defendants Codrington and Aguinaga negligently breached their ministerial duties by failing to submit complete and accurate documents relating to Plaintiff's arrest. including a complete and accurate incident report that included all of the information obtained from Boyd. in violation of APD.SOP.3030. § 4.4.2.

374.

Defendant Aguinaga negligently breached her ministerial duties by failing to provide to the District Attorney all of the information provided to her by Boyd during his interview at SFMC. including Gilbert's telephone number and information that Gilbert did not live on Hawkins Street in violation of APD.SOP.3030. § 4.4.3.

375.

Defendant Aguinaga negligently breached her ministerial duties by failing to attend court as scheduled or subpoenaed on August 26. 2011 in violation of APD.SOP.3030. § 4.4.4.

376.

Defendant Codrington negligently breached his ministerial duties by failing to ensure that

that Plaintiff was the same person identified by Boyd in his 911 call to APD and described in his witness statement in violation of APD.SOP.3030, § 4.15.1.

377.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to conduct a proper preliminary investigation, including "interviews with the complainant and other witnesses, to obtain the who, what, why, where, when, and how of the incident" in violation of APD.SOP.3060, § 4.1.1.

378.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to ask questions in the order in which items appear on the incident report and by failing to complete or fill in all blocks and spaces on the incident report with the required information in violation of APD.SOP.3060, § 4.1.4.

379.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to use the incident report as an investigative tool in conducting the initial investigation into Boyd's complaint and in failing develop or uncover critical facts that would have demonstrated Plaintiff's innocence in violation of APD.SOP.3060, § 4.1.5.

380.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to follow "required procedures" for the officer's completion of the incident report and in failing to obtain "accurate and thorough descriptions of suspects" in violation of APD.SOP.3060, § 4.2.8.

- 92 -

381.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to document information relating to the investigation and the identity of the suspect in violation of APD.SOP.3060, §§ 4.2.3 and 4.2.8.

382.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to "obtain answers to the six basic questions: who, what, when, where, why and how" in violation of APD.SOP.3060, § 4.2.11.

383.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to proofread the incident report from beginning to end and by failing to correct the omission of critical facts relating to, among other things, Gilbert's identity in violation of APD.SOP.3060, § 4.2.11.

384.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to utilize APD's "Investigative Checklists" and ask specific questions as part of their investigation in violation of APD.SOP.3060, § 4.4.

385.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to consider APD's "Common Elements" during their investigation in violation of APD.SOP.3060, § 4.4.1.

386.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to focus their activities appropriately during the preliminary investigation on the protection of persons, collection of evidence, apprehension of criminals at or near the crime scene and solving the reported crime in violation of APD.SOP.3080, § 4.3.1.

387.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to visit and protect the crime scene, failing to locate and identify witnesses, failing to interview key witnesses, and failing to interview Gilbert in violation of APD.SOP.3080, § 4.3.1.

388.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to carefully arrange suspect identification procedures to avoid the danger of an erroneous suspect identification in violation of APD.SOP.3080, § 4.3.2.

389.

Defendants Codrington, Aguinaga and Strom negligently breached their ministerial duties by failing to pursue preliminary investigations to the full extent of their available time and investigative training in violation of APD.SOP.3080, § 4.3.7 even though Boyd was safe at the hospital, Plaintiff made no effort to flee, Plaintiff did not present any danger to anyone, and there was no need to conclude the investigation with unusual urgency.

390.

Defendant Strom negligently breached his ministerial duties by failing to perform any investigative tasks that went beyond those performed by Codrington and Aguinaga, including verifying information relating to Plaintiff's identity and reconciling significant discrepancies in

- 94 -

the stories provided by Boyd and Plaintiff to APD in violation of APD.SOP.5010. § 2.2.

391.

Defendant Strom negligently breached his ministerial duties by failing to properly conduct and complete the investigation into Boyd's case in violation of APD.SOP.5010. § 3.2.5.

392.

Defendant Strom negligently breached his ministerial duties by failing to obtain all pertinent information relating to Boyd's criminal complaint and Plaintiff's identity during his investigation in violation of APD.SOP.5010. § 4.3.1.

393.

Defendant Strom negligently breached his ministerial duties by failing to immediately broadcast detailed and complete suspect lookouts, establish safeguards to preserve the crime scene, determine investigative steps already taken, and direct the search for and collect evidence at the crime scene, arrange for photographs to be taken, and ensure that available evidence was collected in violation of APD.SOP.5010. § 4.6.5.

394.

Defendant Strom negligently breached his ministerial duties by failing to conduct a proper and through follow-up investigation in Boyd's criminal case in violation of APD.SOP.5010. § 4.6.5.

395.

Defendant Strom negligently breached his ministerial duties by failing to contact Boyd within three working days of the case assignment in violation of APD.SOP.5010. § 4.11.1.

396.

Defendant Strom negligently breached his ministerial duties by failing to inform Boyd of

- 95 -

their names, office phone number, times when they could be contacted, the complaint number of the case, the status of the case, and failed to inquire as to further information regarding the case, clarify information initially reported, and document any additional information concerning Plaintiff's arrest in violation of APD.SOP.5010, § 4.11.2.

397.

Defendant Strom negligently breached his ministerial duties by failing to contact Boyd a second time within a 72-hour period in violation of APD.SOP.5010, § 4.11.4.

398.

Defendant Strom negligently breached his ministerial duties by failing to ensure that Boyd was aware of and afforded access to a Victim Witness Assistance Program advocate during the follow-up investigation in violation of APD.SOP.5010, § 4.11.6.

399.

Defendant Howard negligently breached his ministerial duties to by failing to properly hire, train and supervise Putnam, Settles, Keel, Davis, Walton, Vann, Wilson, Deas and other employees of the District Attorney.

400.

Defendant Keel negligently breached her ministerial duties to by failing to properly hire, train and supervise Putnam, Davis and other employees of the District Attorney's Complaint Room.

401.

Defendants Putnam, Settles, Keel, Davis, Walton negligently breached their ministerial duties by failing to properly hire, train and supervise Vann, Wilson, Deas and other employees of the District Attorney.

402.

The District Attorney Defendants negligently breached their ministerial duties by failing to handle Mr. Boyd's criminal complaint and Plaintiff's case in a competent, efficient and expeditious manner with due regard for the rights and feelings of Boyd and Plaintiff in violation of the District Attorney's own policies set forth in the Training Manual.

403.

The District Attorney Defendants negligently breached their ministerial duties by failing to identify errors in the charging documents in Plaintiff's case in violation of the District Attorney's own policies set forth in the Training Manual.

404.

The District Attorney Defendants negligently breached their ministerial duties by failing to interview Boyd and other witnesses to ensure that the charging document was consistent with the facts and correctly identified Gilbert, not Plaintiff, as the suspect, in violation of the District Attorney's own policies set forth in the Training Manual.

405.

The District Attorney Defendants negligently breached their ministerial duties by failing to speak with Boyd and other witnesses before settling on a course of action to prosecute Plaintiff, in violation of the District Attorney's own policies set forth in the Training Manual.

406.

The District Attorney Defendants negligently breached their ministerial duties by failing to maintain an accurate history of events in Plaintiff's case, in violation of the District Attorney's own policies set forth in the Training Manual.

407.

The District Attorney Defendants negligently breached their ministerial duties and ethical obligations by instituting or causing to be instituted criminal charges against Plaintiff when the District Attorney Defendants knew or it was obvious to them that the charges against Plaintiff were not supported by probable cause.

408.

The District Attorney Defendants negligently breached their ministerial duties by failing to contact and interview Boyd, the victim, within twelve (12) hours after Plaintiff's arrest, even though his contact information, including his phone number, was readily available to each of the District Attorney Defendants.

409.

The District Attorney Defendants negligently breached their ministerial duties by failing to properly and timely report, document and convey Boyd's statements to the District Attorney's office after Plaintiff's arrest that the District Attorney had the wrong person in custody.

410.

The District Attorney Defendants negligently breached their ministerial duties by failing to properly and timely act on Boyd's statements to the District Attorney's office after Plaintiff's arrest that the District Attorney had the wrong person in custody.

411.

The District Attorney Defendants negligently breached their ministerial duties by failing to ensure that Plaintiff was released immediately after Boyd's statements to the District Attorney's office after Plaintiff's arrest that the District Attorney had the wrong person in custody.

412.

Putnam negligently breached his ministerial duties by failing to properly and timely determine on August 21, 2011 that APD had wrongly and falsely arrested Plaintiff, an innocent person.

413.

When he had doubts about the identity of Plaintiff as the suspect, Putnam breached his ministerial duties by failing to listen to the 911 tapes, failing to interview Boyd and other witnesses and failing to personally interview Codrington and Strom prior to charging Plaintiff with a crime.

414.

Putnam breached his ministerial duties by falsely concluding, without any evidence, that Plaintiff had used the alias, "Gilbert".

415.

The District Attorney Defendants negligently breached their ministerial duties by failing to ensure that the misdemeanor battery charge on Plaintiff's arrest citation was cleared no later than the time the felony battery charge was nolle prossequied on October 6, 2011.

416.

1. Jackson negligently breached his ministerial duty by failing to properly train and supervise Jackson, Vanderpool, Thornton, Perry and others to investigate claims of innocence by Fulton County Jail inmates.

417.

Jackson, Vanderpool, Thornton and Perry negligently breached their ministerial duties by failing to investigate Plaintiff's claims of innocence.

- 99 -

418.

The Sheriff Defendants negligently breached their ministerial duties by failing to timely release Plaintiff, an innocent person.

419.

As a direct and proximate consequence and result of the acts of Defendants, Plaintiff suffered economic damages, was deprived of her liberty for a substantial period of time, suffered much anxiety and distress over the separation from her family and friends, and much discomfort and embarrassment, her reputation was impaired, and she lost much time from her home and the companionship and care of her family and friends.

420.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

## COUNT VIII
### CONSPIRACY TO FALSELY ARREST,
### MALICIOUSLY PROSECUTE AND FALSELY IMPRISON PLAINTIFF

### (APD Defendants, District Attorney Defendants and Sheriff Defendants)

421.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation contained in the foregoing paragraphs of this First Amended Complaint.

422.

Defendants, acting in concert, engaged in a common design establishing that they positively or tacitly arrived at a mutual understanding as to how they would accomplish, and which facilitated, the unlawful and false arrest, malicious prosecution and false imprisonment of Plaintiff.

423.

Defendants, acting in concert, engaged in actions that resulted in the false arrest, malicious prosecution and false imprisonment of Plaintiff.

424.

Defendant's false arrest, malicious prosecution and false imprisonment of Plaintiff constitute torts for which an action for damages will lie.

425.

Defendants are jointly and severally liable for the acts of the other Defendants done in furtherance of the conspiracy to falsely arrest, maliciously prosecute and falsely imprison Plaintiff.

426.

As a direct and proximate consequence and result of the acts of Defendants, Plaintiff suffered economic damages, was deprived of her liberty for a substantial period of time, suffered much anxiety and distress over the separation from her family and friends, and much discomfort and embarrassment, her reputation was impaired, and she lost much time from her home and the companionship and care of her family and friends.

427.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

### COUNT IX
### COMPUTER INVASION OF PRIVACY PURSUANT TO O.C.G.A. § 16-9-93(C)

#### (APD Defendants, District Attorney Defendants and Sheriff Defendants)

428.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation contained in the foregoing paragraphs of this First Amended Complaint.

429.

Defendants, knowing they lacked the legal authority to do so, committed Computer Invasion of Privacy against Plaintiff by entering their personal information in an APD, District Attorney and/or Sheriff computer and checking it against an information database with the intention of examining personal information about Plaintiff.

430.

Defendants combined and conspired to accomplish the unlawful objective of committing Computer Invasion of Privacy against Plaintiff by unlawful means.

431.

As a direct and proximate consequence and result of the acts of Defendants, Plaintiff suffered economic damages, was deprived of her liberty for a substantial period of time, suffered much anxiety and distress over the separation from her family and friends, and much discomfort and embarrassment, her reputation was impaired, she lost much time from her home and the companionship and care of her family and friends.

432.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

## COUNT X
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### (All Defendants)

433.

Plaintiff incorporates by reference as if set forth fully herein each and every allegation contained in the foregoing paragraphs of this First Amended Complaint.

- 102 -

434.

The acts of Defendants, as set forth herein, were intentional and reckless and so atrocious, extreme and outrageous so as to not be tolerated in a civilized community.

435.

The acts of Defendants, as set forth herein, were so outrageous in character, and so extreme, as to go beyond all possible bounds of decency.

436.

The acts of Defendants, as set forth herein, were intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional and physical distress.

437.

As a proximate result of Defendants' actions and the consequences proximately caused by them, Plaintiff suffered severe humiliation, mental anguish, and emotional and physical distress, and has been injured in mind and body.

438.

Defendants are liable to Plaintiff for their intentional infliction of emotional distress.

439.

The acts of Defendants, as set forth herein, showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences; therefore, Plaintiff is entitled to recover punitive damages.

440.

Plaintiff is entitled to damages, declaratory relief and injunctive relief.

**WHEREFORE**. Plaintiff respectfully prays that the Court provide Plaintiff with the following relief:

1.    That process issue directing the Defendants to answer this Complaint as required by law;

2.    The liability of the Defendants, in fair and just compensation for the damages incurred by Plaintiff, be tried by a jury of twelve (12) competent and impartial jurors;

3.    The Court enter judgment in favor of Plaintiff and against Defendants and award Plaintiff all actual damages, including damages for the loss of Plaintiff's property, loss of benefits, physical pain and injury, mental anguish and emotional distress;

4.    The Court enter judgment in favor of Plaintiff and against Defendants and award Plaintiff nominal damages for violations of Plaintiff's constitutional rights;

5.    The Court award Plaintiff punitive damages to the extent permitted by law because the actions of Defendants in deliberately and maliciously arresting, prosecuting and incarcerating Plaintiff show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to the consequences of their actions;

6.    Declare that Defendants violated Plaintiff's legal and constitutional rights by: (a) conducting a warrantless search of Plaintiff in the absence of probable cause and exigent circumstances; (b) arresting Plaintiff without a warrant and without probable cause; (c) prosecuting and incarcerating Plaintiff with no probable cause to believe that Plaintiff had committed any crime; (d) failing to properly investigate Plaintiff's claims of innocence; and (e) continuing to incarcerate her when all indicted charges had been nolle prosequied;

7.    Require that: (a) Defendants delete and expunge from any and all police records

- 104 -

or databases any information about Plaintiff obtained by APD. the District Attorney or the Sheriff incident to Plaintiff's arrest; (b) APD terminate Officers Codrington. Aguinaga. and Strom; (c) APD ensure that each officer who is or may be involved in the identification. investigation, stop, frisk, arrest and/or detention of alleged suspects be properly trained. prior to assuming any job responsibilities. in the identification of an alleged suspect; (d) APD implement new and more comprehensive Standard Operating Procedures for suspect identification; (e) that APD officers obtain arrest warrants on all felony and misdemeanor arrests; (f) that APD officers attempt to obtain recorded witness statements whenever possible. If a witness statement is not obtained. an explanation as to why this statement was not obtained will be made part of the police report; (g) the District Attorney to ensure that all charges causing an inmate to be detained are accurately and promptly conveyed to the Fulton County Jail in writing; (h) the District Attorney to ensure in writing that the paperwork of dismissal or nolle prossequi is correct so that all charges. including charges that were not indicted. are dismissed at the time the indicted charges are nolle prossequi; (i) that in every case where the victim is notified by the District Attorney of the initiation of a case, and the victim reports that the wrong person has been arrested and incarcerated, that any inmate exonerated by identification is released from custody within two (2) hours; (j) that all communications between the Sheriff and any outside agency. including APD, relating to or questioning the identity of any arrestee shall be documented in writing and maintained by the Sheriff; and (k) the Sheriff to properly and thoroughly investigate all claims of innocence by interviewing the inmate, documenting the discussion with the inmate. and forwarding the inmate's statement to the appropriate district attorney staff;

8.    Enjoin Defendants From: (a) using or employing quotas or a quota system for evaluating officer performance; (h) stopping, detaining, or arresting any individual in connection

with the enforcement of criminal law without probable cause to believe that the particular individual has committed, is committing or is about to commit a criminal offense; (c) making an arrest of a suspect without having the victim make a positive identification of the suspect where the victim is able to do so; (d) conducting a warrantless search and/or arrest of a suspect, unless incident to a lawful arrest, without both probable cause to believe he or she personally is involved in criminal activity and exigent circumstances which preclude the obtaining of a warrant; (e) handcuffing any person without probable cause; (f) assigning aliases to alleged suspects when there is no evidence to suggest the suspect has ever used the alias; (g) further use of the Fulton County District Attorney's Complaint Room; (h) presenting testimony or evidence to a Grand Jury unless the grand jury proceedings are recorded and/or transcribed; (i) allowing any unindicted charge to remain on Plaintiff's record following the time the Fulton County District Attorney agrees to nolle prosequi the indicted charges; (j) allowing the Fulton County Sheriff to hold an inmate on an unindicted charge following the time the Fulton County District Attorney agrees to nolle prosequi all indicted charges against an inmate;

9.     Award attorney's fees pursuant to O.C.G.A. § 42 U.S.C § 1988 and any other applicable provision of law; and

10.    That the Plaintiff have such other and further relief as the Court deems just and proper.

Respectfully submitted this 22nd day of June, 2012.

THE MERCHANT LAW FIRM, P.C.

JOHN B. MERCHANT, III
Georgia Bar No. 533511
ASHLEIGH B. MERCHANT

Georgia Bar No. 040474

341 Lawrence Street, N.E.
Marietta, Georgia 30060
Telephone: (404) 510-9936
Facsimile: (404) 592-4614
E-mail: *john@merchantlawfirmpc.com*
   *ashleigh@merchantlawfirmpc.com*

# EXHIBIT A

404-224-3261     DA COMPLAINT ROOM                          03:58 .m. 08-21-2011          1 /1

# IN THE SUPERIOR COURT OF
## FULTON COUNTY

STATE OF GEORGIA                     *
                                     *
v.                                   *        Agency Case Number
                                     *        112330859
**TERESA CULPEPPER**                 *
                                     *

## STATEMENT OF WITNESS

I, N. D. AGUINAGA, ID#5093, the undersigned, under penalty of prosecution pursuant to O.C.G.A. §16-10-20 for the crime of False Statements and Writings, do state the following:

1.

I am over eighteen (18) years of age, am suffering from no legal disabilities; I make this Statement from personal knowledge.

2.

I am, and at all times relevant here have been, a duly certified law enforcement officer with the Atlanta Police Department

3.

The facts set forth below are true to the best of my knowledge; and facts included in the police report, Agency Case Number 112330859, are incorporated herein.

4.

On the 21st day of **August, 2011**, the defendant(s) herein named:

Name                                 DOB
**TERESA CULPEPPER**                 01/16/1965

did, at approximately **10:51 A.M.**, at **962 Ashby Circle NW., Atlanta, Georgia , 30318**, in Fulton County, Georgia, commit the following acts:

**AGGRAVATED ASSAULT O.C.G.A. §16-5-21**
**On the above stated date and location, ANGELO BOYD was helping TERESA CULPEPPER, known to the victim as TERESA GILBERT, with her vehicle. BOYD received a call from another female while he was repairing her vehicle and CULPEPPER became irate. CULPEPPER attacked BOYD, causing him to get a scratch to his left arm. After calming down CULPEPPER asked if BOYD would put water in the radiator of her vehicle. CULPEPPER then got two bottles of extremely hot water and poured them on BOYD. BOYD received 2nd and 3rd degree burns to his back and shoulders.**

5.

I have received a subpoena to appear at Grand Jury on August 26, 2011 at 8:30AM .
I will provide a copy of all supplemental and investigative reports to the District Attorney at that time.

FURTHER WITNESS SAYETH NAUGHT.

SWORN AND SUBSCRIBED telephonically,
this ___ day of ____, 20__
_____ Notary Public
My Commission _____

# EXHIBIT B

Fulton County District Attorney's Office - Public Affairs                                3/2/12 10:49 AM



## Meet the DA

Currently serving his third term following an election in
which he was unopposed, Paul L. Howard, Jr. first
assumed the Office of Fulton County District Attorney in
January 1997—becoming the first African-American to be
elected district attorney in the history of the State of
Georgia. He succeeded Lewis Slaton, who held this
position for 31 years. Prior to being elected district
attorney in 1996, Mr. Howard served as Fulton County's
Solicitor General for four years.



During his first two terms in Office, Paul Howard has achieved a wide range of
ambitious goals, transforming the District Attorney's Office and revolutionizing the
County criminal justice system in the process. Some highlights of these changes include
top-to-bottom administrative re-structuring of a seriously outdated Office featuring the
installation of five Deputy District Attorneys who provide day-to-day supervision of the
Office's divisions; the installation and implementation of a computer-based case
management system; as well as the creation of specialized prosecution units, including
Major Felony, Crimes Against Women & Children, White Collar Crime, Major Drugs,
Public Integrity, Illegal Firearms, and Hate Crimes. Additionally, Mr. Howard has
established the Fulton County "Complaint Room" and, with it, has implemented a front-
end case-screening system that has reduced the time required to formally charge
defendants from several weeks to under one hour—a change that is saving the County
millions of dollars in jail-housing costs annually.

Also, in 2000, he introduced the concept of "Community Prosecution" to the County
when he opened the first Community Prosecution Office in southwest Atlanta (and has
since overseen the opening of a second office in another of the city's neighborhoods).
Through this program, he has implemented an initiative known as "Neighborhood Fresh
Start," which is designed to systemically attack the problem of illegal drugs in our
community. "Fresh Start" involves the seizure of residential property used in illegal drug
activity that is then renovated and leased to a law enforcement officer for the period of
one year, at which time the home is re-sold to a low-income family. The program's first
police officer moved in to his re-modeled home in the Spring of 2003.

Paul Howard has also spearheaded efforts to create a permanent, state-of-the-art
Children's Advocacy Center in Fulton County. A Board of Directors (on which he

serves) was formed in 2002, and a fundraising campaign got underway in 2003 with a goal of raising $15 million for the Center.

Mr. Howard's law career began in 1976 with the City of Atlanta as an assistant solicitor. A year later he became the City's deputy solicitor. He remained in this position until 1980 when he joined Fulton County as an assistant district attorney in Mr. Slaton's office, where he served eight years. Upon leaving the District Attorney's Office, Mr. Howard worked for three years as an attorney for the Atlanta law firm of Thomas, Kennedy, Sampson, Edward & Patterson.

Active in professional and community activities, Mr. Howard currently serves as a member of the Board of Directors of the Partnership Against Domestic Violence, Georgians for Children, and the Fulton Atlanta Community Action Authority. He was appointed to Governor Roy Barnes' Commission on Certainty in Sentencing and previously served as co-chair of the Senate Structured Sentencing Commission. Mr. Howard also serves as chairperson of the Gate City Bar Association Government Law Section and the Atlanta University Criminal Justice Public Service Institute Courts Committee and is a member of the Georgia Association of Black Elected Officials, the National Black Prosecutors Association, as well as 100 Black Men of Atlanta. He has received numerous awards, including the Georgia Women's Political Caucus' 1997 "Good Guy Award," Atlanta Community Prevention Coalition's "Outstanding Effort to Stop the Violence Award" and the Gammon Theological Seminary's "Outstanding Community Service Award." Mr. Howard was recently recognized by the Atlanta Business Chronicle in its annual "Who's Who in Law & Accounting" issue and as "One of the 50 Most Influential Georgians" by Georgia Informer magazine.

 A cum laude graduate of Morehouse College in political science, Mr. Howard received the school's Marvin C. Magnum Legal Achievement Award. His exemplary undergraduate performance also earned him an academic scholarship at Emory University's School of Law. While doing graduate work at Emory, Mr. Howard became the president of the Black American Law Students Association and later the vice president of the Student Bar Association.

Mr. Howard is a native of Midville, Georgia. He is married to Petrina Moody and has three children, a boy and two girls.

home • office overview • latest news • in the community • contact us • employment • search site • related links

**Questions, Comments?**
Please email: nicole.vaughn@co.fulton.ga.us

### Office of the Fulton County District Attorney

136 Pryor Street -- Third Floor

Atlanta, Georgia 30303-3477

Phone: (404) 612-4981 Fax: (404) 893-2769

© 2004  Fulton County District Attorney  all rights reserved



## Criminal Intake and Charging

### Screening and Charging Division

Once it is determined that a criminal case warrants further investigation by the District Attorney's Office, the Screening and Charging Division is responsible for screening cases to assess if prosecution is warranted. Attorneys are responsible for determining the charges (whether by indictment or accusation) and determining what further information is needed to successfully prosecute the case. As the District Attorney's Complaint Room concept expands, it is expected that the charging functions of this division will diminish and eventually be merged into the Complaint Room.

### Complaint Room

On June 5, 2001, the Fulton County Complaint Room accepted its first case. Over the course of the next ten weeks, the District Attorney's Office conducted the pilot phase of this new front-end case-screening system. The system is designed to significantly impact felony case outcomes, promote equality, and restore swiftness and certainty to the pace of criminal justice in the City of Atlanta and Fulton County.

Specifically, the Complaint Room process is intended to effect a dramatic re-allocation of police resources from mandatory court appearances to managed "front-end" case documentation. The system will also provide for a significant increase in the beneficial interaction between police officers and prosecutors when criminal cases are first being made against arrestees, which in turn results in an enhanced quality of cases accepted for prosecution and a consequential increase in the length of sentences for defendants — especially those convicted of drug crimes and repeat offenses. It is also expected that there will be a reduction in the pre-trial inmate population at both the City and County jails as well as a decrease in the number of felony cases appearing on Superior Court calendars. Finally, this new system promises a total potential savings of roughly $5 million annually to Fulton County taxpayers.

During the pilot phase, the Complaint Room processed 61 felony defendants, primarily as the result of arrests by the Atlanta Police Department's "Red Dog Squad," the first police unit to be phased into the system. So what were the results?

There was a considerable reduction in the number of court appearances required of police officers. Under the current system, those 61 arrests would have entailed 77 associated court appearances for the arresting officers. Under the Complaint Room system, only four were necessary — a 93% reduction.

Nor did the Complaint Room process create an unreasonable "return-to-service" time for police officers—an understandable concern initially expressed by law enforcement. "Return-to-service" time refers to the period between the time the officer first makes contact with the Complaint Room to inform staff that an arrest has been made and when the officer is released by the Complaint Room staff. On average, during the pilot phase, police officers were out of service only 27 minutes completing paperwork and procedures.

The time period between the initial arrest by police and formal charging by the District Attorney's Office was also dramatically reduced—from 111 days for defendants on bond to six hours under the new system. For those defendants who decide to enter a plea, there was an equally dramatic reduction in the time between formal charging and final disposition in Superior Court—from 96 to five days.

There was also a reduction in the number of defendants booked into the County Jail. Of the 61 defendants processed under the new system, only 21% were forwarded on to the jail. And the majority of those were already under sentence and awaiting pick-up by the State Department of Corrections. This fact promises to save the County millions of dollars annually in jail-housing costs alone.

This new system will also aid in reducing the existing caseload in Fulton Superior Court. The pilot phase showed that, of the 30 defendants who entered guilty pleas, nine had other pending cases in Superior Court. For 30 pleas, final dispositions were entered on a total of 45 Superior Court cases.

Finally, the Complaint Room system also reduced the total number of cases that ultimately would have gone on to the Superior Court docket. Fifteen percent of the pilot phase cases were immediately screened out by this Office as inappropriate for further prosecution, while another 50% of cases were disposed by plea before ever making it to a Superior Court caseload. In total, the Complaint Room system screened out 65% of cases. While this percentage would surely be somewhat reduced once more serious felonies are incorporated, it is anticipated that the number of cases forwarded to Superior Court could be reduced by roughly 50%—resulting in nearly 7,500 fewer cases annually.

The pilot phase ended on August 11, 2001. Since that time, the Complaint Room model has absorbed other special units within the Atlanta Police Department—Vice, Burglary, Theft, and Crimes against Persons—as well as the entire Fulton County Police Department into the system.

The early results demonstrate the enormous potential of the Complaint Room system to streamline the processing of felony defendants in Fulton County. The collaboration and cooperation between the City of Atlanta and Fulton County needed to make this system work proves that a more seamless and efficient—and, in turn, fair—process is possible and promises to restore public confidence in the criminal justice system.

**Questions, Comments?**
**Please email: nicole.vaughn@co.fulton.ga.us**

### Office of the Fulton County District Attorney

136 Pryor Street – Third Floor

Atlanta, Georgia 30303-3477

Phone: (404) 612-4981 Fax: (404) 893-2789

© 2004, Fulton County District Attorney, all rights reserved



## Prosecution Support

### Victim-Witness Assistance Program



The mission of the Victim-Witness Assistance Program is to provide quality and compassionate assistance to victims and witnesses of crime in Fulton County who are involved with the criminal justice system at the Superior Court level. To accomplish this mission, the Program is staffed by professional advocates and counselors and utilizes the support of interns from local colleges and universities.We assist approximately

10,000 clients a year.

Under the "Victims Bill of Rights," the District Attorney's Office is required to provide notification and other basic services to crime victims. Prosecutors are responsible for informing victims of all court dates as well as the status of a case from the time of the initial charging decision to final disposition. Some victims are also entitled to compensation. Through this Program, the office ensures that victims are aware that compensation may be available to them and that they receive the assistance they need to apply.

The Victim-Witness Assistance Program provides a variety of services designed to meet the needs of crime victims, witnesses and their families. Case information as well as explanations of and information about the criminal justice system are made available. Members of our staff also provide clients with an orientation to the courtroom setting as well as short-term counseling and can make referrals to community agencies when long-term therapy is necessary.

### Criminal Investigations Division

The criminal investigations division provides support and resources to Assistant District Attorneys during the prosecution of a criminal case. The division's Investigators essential duties are to assist the attorney in the prosecution of a criminal case. An Investigator's duties are often diverse in nature. Investigators must locate and interview victims and witnesses, draft subpoenas and search warrants, obtain and review police reports from various Law Enforcement Agencies, confirm and ensure witness cooperation for trials, prepare bench warrants, and any other duties that will aid the Prosecutor as they present

his or her case. The investigator provides the Prosecutor with a quick investigative resource capable reaching out beyond the limits of a single judicial circuit. Such a capabilities become necessary when Assistant District Attorneys need assistance in the preparation of cases, location of witnesses, and process and service search warrants outside of Fulton County.

The Investigations Division is composed of professional law enforcement personnel who provide a functioning liaison to the various police agencies (local, state, and federal), which operate daily in Fulton County and other metro Atlanta areas. The investigators employed with the division have a wealth of experience that includes backgrounds in local, state, and federal law enforcement. Out greatest strength, however, lies in our commitment to personal and professional excellence. Through this commitment the Criminal Investigation Division continues to strive to obtain its most important goal, to provide a safer community for the citizens of Fulton County.

### Training Unit

Under the supervision of the Deputy District Attorney for Administration and Training, an intensive "new attorney training" class is offered once each year for approximately ten weeks. All assistant district attorneys who have begun employment with the office in the proceeding year are required to complete the class. Topics include office policy and procedures, ethics and professionalism, pre-trial motions, plea negotiations and recommendations, trial preparation, and prosecutorial essentials such as jury selection, opening statements, direct and cross examinations of witnesses, and closing arguments. The class concludes with a mock jury selection and team trial.

In addition, other specialized training is provided including updates on state law, guest speakers from agencies such as the Board of Pardons and Paroles who may advise trial attorneys on current policy, classes in computerized legal research, specialized training for particular types of crimes or trials and workshops on Sensitivity and Cultural Diversity.

### Public Affairs Dept.

The Public Affairs Department is responsible for all media relations and public information functions and serves as the District Attorney's primary liaison with the news media. While information regarding pending criminal cases must be safeguarded in order to ensure effective prosecution of felony defendants, this need must be balanced with the public's right to know. The Public Affairs Department helps to ensure not only the accuracy of information released to the media from this office, but also facilitates the ease and timeliness with which the Office is able to make this information available. Significant national media



coverage facilitated by Public Affairs in recent years has included segments on "Dateline NBC" and "America's Most Wanted."

In addition to media relations, the Department is responsible for the production of a variety of printed materials such as brochures for the Victim-Witness Assistance Program, community newsletters, informational pamphlets, and the Office's annual report.

The Public Affairs Department also works with Community Affairs to coordinate and present the District Attorney's annual "Voice for Victims" award given in recognition of outstanding service to victims of crime in Fulton County. Public Affairs works with Community Affairs on other as-needed special events throughout the year.

**Community Affairs**

The District Attorney's Community Affairs Department acts as the primary liaison with the community and oversees a variety of crime prevention programs.

The Community Affairs Department represents the District Attorney at community gatherings, forums, Neighborhood Planning Unit meetings, senior citizens facilities, meetings with other elected officials, and a variety of other events. The department also handles requests for information from the community and keeps citizens abreast of the status of various cases pending in the Office.

Community Affairs oversees both the Junior District Attorneys Program and Project Legal Lives, the Office's two educational outreach programs targeting school children.

The Community Affairs Department also works with Public Affairs Department to coordinate and present the annual "Voice for Victims" award given in recognition of outstanding service to victims of crime in Fulton County as well as other special events throughout the year.

home • office overview • latest news • in the community • contact us • employment • search site • related links

**Questions, Comments?**
.   Please email: nicole.vaughn@co.fulton.ga.us

### Office of the Fulton County District Attorney

136 Pryor Street – Third Floor

Atlanta, Georgia 30303-3477

Phone: (404) 612-4981 Fax: (404) 893-2769

© 2004  Fulton County District Attorney, all rights reserved

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

TERESA ANN CULPEPPER,    )
                                   )
       Plaintiff,          )
                                   )
vs.                               )
                                   )
**CITY OF ATLANTA,**    )
**GEORGE N. TURNER**, individually,    )
**CALVIN MOSS**, individually,    )
**ERNEST J. FINLEY, JR.**, individually,    )
**ERIKA SHIELDS**, individually,    )    CIVIL ACTION
**TIMOTHY QUILLER**, individually,    )    FILE NO. 2012-CV-215514
**JEFFERY L. GLAZIER**, individually,    )
**NICOLE D. AGUINAGA**, individually,    )
**JAIDON CODRINGTON**, individually,    )
**JUSTIN STROM**, individually,    )
**FULTON COUNTY, GEORGIA,**    )
**THEODORE JACKSON**, individually,    )
**LENORE VANDERPOOL**, individually,    )
**SHARON JACKSON**, individually,    )
**ASHLEY THORNTON**, individually,    )
**VERNISSA PERRY**, individually,    )
**PAUL L. HOWARD, JR.**, individually,    )
**STEPHEN PUTNAM**, individually,    )
**WAVERLY SETTLES**, individually,    )
**REBECCA KEEL**, individually,    )
**MELANIE DAVIS**, individually,    )
**ARTHUR WALTON**, individually,    )
**WESLEY VANN**, individually,    )
**JAMIE WILSON**, individually,    )
**FELICIA DEAS**, individually,    )
                                   )
       Defendants.        )
                                   )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a true and correct copy of the foregoing *Plaintiff's First Amended Complaint For Damages And Declaratory And Injunctive Relief* on counsel of record by depositing same in the United States Mail, with adequate postage affixed thereon, and addressed to:

David Fife, Esq.
Adkins and Fife, LLC
6400 Powers Ferry Road

- 108 -

Suite 355
Atlanta, Georgia 30339

City of Atlanta
c/o Mayor Kasim Reed
68 Mitchell Street, Suite 4100
Atlanta, Georgia 30303

Mr. Calvin Moss
12453 Highway 92
Woodstock, Georgia 30188

Mr. Ernest J. Finley, Jr.
226 Peachtree Street
Atlanta, Georgia 30303

Mr. Jeffrey L. Glazier
180 Southside Industrial, S.E.
Atlanta, Georgia 30354

Fulton County, Georgia
c/o Commissioner John H. Eaves
141 Pryor Street, Room 4038
Atlanta, Georgia 30303

Ms. Lenore Vanderpool
185 Central Avenue
Atlanta, Georgia 30303

Ms. Sharon Jackson
185 Central Avenue
Atlanta, Georgia 30303

Ms. Ashley Thornton
185 Central Avenue
Atlanta, Georgia 30303

Ms. Vernissa Perry
185 Central Avenue
Atlanta, Georgia 30303

Paul L. Howard, Jr., Esq.
136 Pryor Street, 3rd Floor
Atlanta, Georgia 30303

Stephen Putnam, Esq.

- 109 -

136 Pryor Street, 3rd Floor
Atlanta, Georgia 30303

Waverly Settles, Esq.
136 Pryor Street, 3rd Floor
Atlanta, Georgia 30303

Rebecca Keel, Esq.
136 Pryor Street, 3rd Floor
Atlanta, Georgia 30303

Melanie Davis, Esq.
136 Pryor Street, 3rd Floor
Atlanta, Georgia 30303

Arthur Walton, Esq.
136 Pryor Street, 3rd Floor
Atlanta, Georgia 30303

Ms. Jamie Wilson
136 Pryor Street, 3rd Floor
Atlanta, Georgia 30303

Mr. Wesley Vann
136 Pryor Street, 3rd Floor
Atlanta, Georgia 30303

Ms. Felicia Deas
136 Pryor Street, 3rd Floor
Atlanta, Georgia 30303

This 22 day of June, 2012

**THE MERCHANT LAW FIRM P.C.**

JOHN B. MERCHANT, III
Georgia Bar No. 533511

- 110 -